No. 20950.

AMERICAN INDUSTRIAL LEASING COMPANY
*v.* W. J. COSTELLO.
(418 P.2d 881)

Decided October 10, 1966.

PHILIP A. ROUSE, for plaintiff in error.

RAPHAEL J. MOSES, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE SUTTON delivered the opinion of the court.

THIS controversy arises out of a mining agreement entered into by W. J. Costello, hereinafter referred to by name or as the plaintiff, and the Superior Mines Corporation, which will hereinafter be referred to as Superior. The American Industrial Leasing Company is Superior's successor in interest, and will be referred to as American or as the defendant.

On or about April 3, 1952, Costello, as the lessee, and Superior as the lessor, entered into a mining lease

whereby Costello was to mine certain complex ores containing gold, silver, lead, copper and zinc near the town of Bonanza in Saguache County. On October 18, 1954, the term of the lease was extended to March 25, 1965. Among other things, the lease provided that royalty payments would be made by Costello. Thereafter, the plaintiff worked the mine until January 1957, at which time the lease was modified by a new agreement which was drafted by defendant's attorney, Costello not being then represented by counsel. It is this agreement with which we are here concerned. It provided in pertinent part as follows:

"* * * (Costello) agrees to deliver at the portal of the tunnel * * * the out put (sic) of said mines * * *, and * * * (Superior) agrees to transport said ores from the portal of the tunnel to its mill and to pay * * * (Costello) the sum of Four ($4.00) Dollars per ton for all ore broken in the mine * * *.

"* * * the amount payable therefore paid to the said W. J. Costello on or about the 20th day of the month succeeding the month in which any deliveries of ore are made, * * * no royalty as provided for in the lease * * * will be charged upon the ore, * * * but a deduction of 20 cents per ton will be made by (Superior) * * * from the increment payments after milling as hereinafter provided.

"* * * all milling ore broken will be delivered to Superior * * * at the mine portal * * * as the ore becomes available, and delivery * * * shall be the responsibility of (Costello) * * *.

"In addition to the per ton payment * * *, less the deduction of 20 cents per ton * * *, (Superior) agrees to make further increment payments upon ore milled according to the value of the ore disclosed by daily assays of samples collected from the day's run in the mill, said payments to be as follows:

[Hereinafter appears a graduated schedule of increment payments to begin only when the value of the

"ore" exceeds $12.50. In addition, "any ores under the value of $10.00 per ton, the quantity thereof shall be deducted from the amount sent to the mill for base payments." Ore milled and assaying $25 to $30 per ton was to receive an increment of $4 per ton.]

"(Costello) * * * reserves the right to ship ores of sufficient value to justify direct shipment to the smelter * * * and to pay a royalty of 12½% on any such ores which are shipped direct to the smelter.

"(Costello) * * * agrees to use due diligence and exert every effort to provide (Superior) * * * with a tonnage of fifty (50) tons per day of mill ore and will diligently endeavor to increase said tonnage from time to time as the condition of the mine and proper mining practices permit."

The agreement thereafter provides for payment in the amount of $14 a foot should development be necessary through barren ground. Thus, a reading of the contract leads us to the conclusion that this was not only an ore buying agreement but also a limited development contract as well.

Costello continued to operate the mine for about twenty-two months after the January 1957 amendment which was until sometime around the 19th, 20th or 22nd of October 1958, when Superior refused to accept any more ore. It appears from the record and briefs that this was primarily due to the flotation mill, which Superior had constructed, being unable wholly and properly to recover existing values in the complex ores. It further appeared that out of the first 2235 tons of ore furnished by Costello and milled by defendant that defendant had suffered a loss of $10,003. And, it was *after* such losses had occurred that defendant stated it would not accept more ore.

On October 27, 1958, the plaintiff filed a complaint which incorporated 3 claims, seeking therein damages for breach of contract which he later asserted to be in the amount of $134,131.66. On November 24th of the

same year, American took over from Superior. An amended answer was filed on behalf of the defendant in August of 1962, wherein American asserted that it was really Costello who had breached the agreement, and that it was entitled to recover on its counterclaims in the amount of $30,000. Issue was joined when, in December of the same year, the plaintiff filed his answer to the counterclaims.

A trial was had to the court on April 15, 1963. Thereafter, on June 17th, the court entered its judgment wherein it dismissed Costello's third claim and all of American's counterclaims. It awarded plaintiff the amount of $19,782.86, plus interest since November 20, 1958, on his first and second claims. A motion for a new trial was dispensed with. The defendant now seeks reversal by way of writ of error before this court.

American urges three grounds of error which may be summarized as follows:

(1) That plaintiff, and not the defendant, committed the first breach of the agreement;

(2) That damages should not have been awarded for increment payments on ore which was never milled; and,

(3) That the court incorrectly computed damages.

We turn now to the first assignment of error. The trial court found that the 1957 agreement was intended as a modification of the provisions of the 1952 lease. It then determined that no formal termination as provided for in the original lease was effected. Finally, it reached the conclusion that continuing performance by Costello was prevented by Superior's failure to accept more ore.

American urges, however, that its refusal to accept ore was engendered by prior acts committed by the plaintiff, each of which constituted a legal breach. It emphasizes three alleged wrongful acts, viz: first, that Costello failed to deliver, on a monthly basis, the ore that was mined as he was required to do under the terms of the 1957 agreement; second, he failed to de-

liver 50 tons a day; and, third, he did not deliver "milling ore." The difficulty with the defendant's position, however, is that the trial court on disputed evidence, found that defendant committed the first breach of the agreement — a finding that we, of course, must uphold as being clearly justified by this record. Let us examine the evidence in this regard.

It appears that approximately 3000 tons of broken ore still remained in the mine when Superior undisputedly refused further deliveries. As we read the applicable contract provisions, Costello was to be paid for "all ore broken" during the succeeding month after "the month in which *any* deliveries of ore are made." (Emphasis supplied.) Furthermore, the plaintiff was to use "due diligence and exert every effort" to provide 50 tons a day. We find no ambiguity in these quoted requirements. Defendant drafted the contract and if there were any ambiguity it would, of course, be construed against it. *Globe National Bank v. McLean,* 84 Colo. 207, 269 Pac. 9 (1928). And, in addition the rule is that courts must pass upon contracts as written, not as if they contained language which might or should have been used. *Hauser v. Foster,* 103 Colo. 58, 82 P.2d 775 (1938). Also, when the language of a contract is clear, its effect will not be destroyed by construction. *German Ins. Co. v. Hayden,* 21 Colo. 127, 40 Pac. 453 (1895).

As we read this agreement it seems clear that Costello was to be paid $4 a ton for all ore broken, and that payment would be made during the next succeeding month that any ore, regardless of the amount, was delivered to the mine's portal. On the other hand, Costello was charged with the responsibility of using due diligence, and to make every effort to supply 50 tons a day. Though there is evidence that Mr. Johnson, American's president, had, on some occasions, asked when more ore could be delivered, it does not follow that Costello was not exercising due diligence and every effort to

procure more ore than he was delivering to the mill. In fact, the contrary would appear due to the admittedly large quantities already broken out in the mine and which American obviously would not accept.

■ Besides, the contract does not call for a mandatory 50 ton a day delivery as the defendant would have us believe. Rather, the obligation that was assumed by Costello was, as previously stated, to "use due diligence and exert every effort" to do so. After a careful reading of the record, we agree with the trial court's conclusion, in regard to this phase of the dispute, that:

"* * * However, he (Costello) did not undertake to produce 50 tons of ore per day. *There is no evidence that he failed to exercise due diligence in the matter.*" (Emphasis and part in parenthesis supplied.)

■ The defendant, however, next urges that Costello was obligated to supply "milling ore" as such is known in the trade. During the trial, it had one Salvadore Del Rio, an engineer and geologist, testify that "milling ore" is ore upon which "* * * you must realize a profit or what you handle is not milling ore." American now argues that since Costello only supplied, at the most, "break-even" ore, he breached the contract in that regard.

Here again defendant is in error for the contract calls for increment payments to be paid on "ore milled" and not "milling ore" there being a substantial difference in the two terms as used in the mining business. Again we agree with the trial court when it said:

"* * * But the January 10, 1957 contract makes no mention of charges for transportation and treatment. It is nothing more or less than an ore purchase contract * * * the contract is plain and unambiguous that the parties considered any ore of mill grade for the purposes of their contract, but that only that having a value as disclosed by the daily assays of samples collected from the day's run in the mill of $12.50 or over as qualifying for the increment payment. * * *.

"If defendant intended that the increment payments should be based on the value of the ore after deduction of charges for transportation and treatment, penalties, etc., it prepared the contract and it should have made provision for a formula upon which value should be determined. Since the only provision is that the value should be based on the daily assays of samples collected from the day's run in the mill, and there is no ambiguity in this language, the defendant is bound by the terms of its contract. It is a matter of common knowledge in the mining industry that the term 'assay' means the value of the ore as disclosed by the assay, based on the market values of the various minerals found in the ore, and without deduction for transportation, treatment, etc. of the ore. Had the contract used the terms 'net smelter returns' or 'net mill returns', there would then be some substance to its contention."

In regard to this issue even defendant's own expert, Del Rio, admitted that the term "ore" is understood to be the mineralized rock before milling when he said:

"* * * I would like, if I may, to preface my answer so that they (sic) would be understood, preface what I am going to say by unraveling some misconception *generally had in the industry.* In the first place, 'ore' is an economic term. You have mineralized rock or you have ore. Mineralized rock can become ore tomorrow." (Emphasis supplied.)

We conclude that, until the time that Superior refused further delivery, Costello had done no act which could be characterized as a substantial breach of the contract which would have warranted Superior's refusal to accept more ore.

American's next ground is its assertion that the court erred in awarding increment payments on the ore that was never milled but which American had paid $4 a ton for under the mining payment schedule. The trial court found that, as of the moment that the defendant breached the contract by refusing to accept any

more ore, 5,929.7 (which actually should read 5,927.9) tons of ore had been mined for which no increment payments had been made. About one-half of this amount had actually been transported to the mill, part of which was subsequently milled, while the rest was found to have been stockpiled. The remainder of the ore, which had not been delivered to the portal, was left in the mine. The court awarded increment payments for all the mined ore totaling 5,929.7 (5,927.9) which had not yet had increments paid thereon, this included the amount remaining in the mine. In our view the evidence supports such an award for as the learned trial judge held:

"Performance by the plaintiff, as to the * * * tons left in the mine, was prevented by defendant's refusal to accept any more ore. The law does not require the doing of a useless thing. It would have been useless for plaintiff to transport the ore broken in the mine to the portal when he had already been notified by defendant that the ore would not be accepted. Defendant rendered it impossible for plaintiff to complete his performance by delivering the ore to the portal of the mine. True, he could have gone to that expense and brought the ore to the surface, but the law does not require this of him under circumstances such as we have here. If performance of an obligation is prevented by one of the parties to the contract, the party thus prevented from discharging his part of such obligation is to be treated as though he had performed it." [Citing *Empson Packing Co. v. Clawson,* 43 Colo. 188, 95 Pac. 546 (1908)].

As its third and last ground, American urges that the trial court incorrectly assessed certain damages. By way of background, the trial court first found that the defendant had prevented the taking of daily assays of the ore in question by its breach of the contract. It next took the grand average of the assays that were run by the defendant to arrive at a figure of $27.28 a ton. To this it applied the increment schedule agreed to in the

contract and established that the increment payment that was due came to $4 a ton, less 20 cents per ton in lieu of royalty payments, for a total figure of $22,532.86. From this it subtracted the amount of $1.25 per ton representing the cost of transporting the 2,200 tons of ore, which the court concluded remained in the mine, to the portal for a total offset of $2,750. Judgment was then awarded in the amount of $19,782.86 plus interest since November 28, 1958.

In addition to the arguments which have already been resolved and which do not have to be re-examined here, American asserts that the award is erroneous because: (a) the court should have taken the mean average and not the grand average of the assays which were run; (b) that the figures used by the court were erroneous and did not come to $27.28 on a mathematical basis; and (c) the offset figure was incorrect in that the uncontroverted evidence showed that 2,929.9 tons remained in the mine and not 2,200 tons as determined by the trial court.

We do not agree with American with reference to its first contention. The trial court found the evidence to be deficient due to the defendant's having failed to keep complete records and due to its failure to run daily assays on ore as it was milled as it was required to do by its contract — which of course it couldn't accomplish as to this ore since it had not milled it as required. Yet, it is obvious that the plaintiff was entitled to increment payments by virtue of the contract. It has been recognized in an injunctive action involving non-competition in the sale of a business, that where one party's wrongful conduct has rendered difficult the assessment of damages, he cannot escape liability simply because it has become difficult to measure the damage with exactness. *Ditus v. Beahm,* 123 Colo. 550, 232 P.2d 184 (1951); 43 C.J.S. *Injunctions* § 84. And the same rule has been applied by the California Supreme Court in *Zinn v. Ex-Cell-O Corp.,* 24 Cal.2d 290,

149 P.2d 177 (1944), in a suit for rescission of the sale of corporate stock or in the alternative for damages. The California court also held that future profits could be shown as one element of the damage. We believe that a similar rule should apply here where Costello was prevented from proving the actual value of his ore because defendant refused to mill and assay it as the contract required. Thus, under the facts presented, we find no error in the method used by the trial court.

We next treat American's argument concerning the values used by the court in reaching the grand average used by it. Defendant asserts that the figure used was incorrect, reasoning as follows: Plaintiff's Exhibit E is a compilation by percentages of the mineral content in the ore upon which assays were run. Plaintiff's Exhibit F is a summary of the ore's purported monetary values based upon then-existing figures taken from mining journals which both parties stipulated could be used as authority. Since these journals do not appear in the record, we do not have the benefit of their use. (As we compute it, though, the correct figure should have been $26.51 per ton instead of the $27.28 used by the trial court and $25.80 shown in a recomputation in Costello's brief.) Suffice it to say, however, that both Exhibit F and the Appendix to Costello's brief, which compile the assay values in terms of cash value, show grand averages of over $25, but less than $30 per ton which, according to the contract results in an increment payment due of $4 a ton. So any objection which American may have as to the substance of plaintiff's Exhibit F is immaterial.

We do agree, however, with American's contention that the off-set of $1.25 per ton on *2200* tons as computed by the trial court was incorrect. Nothing in the record justified the court in using that tonnage figure. Costello alleged that 2,929.9 tons remained in the mine. Similarly, American's president, Johnson, stated that 2235 tons of ore were run through the mill with 735

tons in the stockpile and the "remainder in the mine."

Plaintiff now asserts that the following colloquy between the court and Costello introduced evidence that 2200 tons was the correct figure, and that because of this, the trial judge was justified in using that figure. He asserts, therefore, that it is not subject to objection on this writ of error. This is the examination:

"Q. There was some testimony that there was 2200 tons and some 700 odd tons in the bin or stockpile. Would you clear that up for me please?

"A. The hauling was up to the company, and I have never saw (sic) any record of what amount was brought out from the mine. I've never been presented with an account on how much ore was brought out of the mine.

"Q. When you say out of the mine, what do you mean?

"A. How much was hauled at the bins. The hauler, Smythe was his name, was paid for hauling, and he'd be the only one that I'd know that would have any record of it, unless the company has."

First of all, we fail to find where in the record, prior to this dialogue, there was any testimony that 2200 was the tonnage in the mine. Furthermore, this quotation is incomplete, and takes on an entirely different meaning when viewed in conjunction with the remaining discourse which was:

"Q. What is this seven hundred tons out of the mine and the twenty-two hundred tons out of the mine. That's what I don't understand.

"A. There was ore milled from the stockpile. I don't know the exact amount that was left.

"Q. That the company loaded and hauled down to the mill?

"A. And it was picked up and hauled to the mill.

"Q. Is it your testimony that this whole *2929 tons* is still in the mine?

"A. As far as I know." (Emphasis supplied.)

We conclude, therefore, that the record shows that 3000

tons were transported to the mill and that 2929.9 tons still remained in the mine.

In conclusion we agree with the trial court when it said in its Findings that this case merely shows that defendant felt it had made a "bad bargain" in its last amended agreement. The court's comments, which referred to defendant's loss on the first 2235 tons of ore milled and which summed up defendant's attempt to terminate were as follows:

"For some reason not apparent from the evidence, it would appear that the defendant made a bad bargain with plaintiff. This is evident from the conversation between its president and one of its engineers, wherein he sought some means of terminating the contract. While this is unfortunate, Courts do not open their doors to those who are suffering merely from their own bad bargains, not induced by any misrepresentations. *Nelson v. Van Schaack & Co.*, 87 Colo. 199, 286 P. 965. It is quite evident that the parties dealt at arms length in negotiating the contract, and there is no suggestion that either party engaged in either fraud or misrepresentation. Both were familiar with the mine, since plaintiff has been leasing there for several years prior to January 10, 1957, and defendant's predecessor had owned the property for some time, at least from 1952, when the lease was entered into. The ore being produced by defendant was of about the same quality as that produced by plaintiff. The defendant built the mill with full knowledge of these facts, and if its mill could not be made to pay, or if it was inefficient and did not recover enough of the values in the ore, that is not the fault of the plaintiff. Likewise, there was no showing of any mutual mistake of fact in the negotiation and preparation of the contract, or that the written instrument did not fairly state the agreement of the parties."

That part of the judgment awarding Costello a gross increment payment in the amount of $22,532.86 is mathematically corrected to read $22,533.62 and is affirmed;

however, that portion representing a deduction of $1.25 based on 2200 tons is reversed with directions that an offset figure in the amount of $3,662.38 be substituted therefore, the substitution representing the amount of 2929.9 tons multiplied by $1.25.

It is therefore ordered that the judgment be affirmed in the amount of $18,871.24 plus costs, together with interest calculated from November 28, 1958.

MR. JUSTICE DAY and MR. JUSTICE FRANTZ not participating.