DENVER CENTER FOR THE PER-
FORMING ARTS, a Colorado
non-profit corporation,
Plaintiff-Appellant,

v.

Thomas P. BRIGGS, Manager of Revenue for the City and County of Denver; The Sales, Use and Occupational Tax Section of the Treasury Division of the City and County of Denver; The City and County of Denver, a Municipal Corporation; The Board of Council, City and County of Denver, and all members thereof; and Federico Pena, Mayor of the City and County of Denver, Defendants-Appellees.

No. 83SA146.

Supreme Court of Colorado,
En Banc.

Feb. 25, 1985.

**302**

Robert E. Goodwin, Geer & Goodwin, P.C., Denver, Lester Ward, Predovich, Ward & Banner, Pueblo, for plaintiff-appellant.

Stephen H. Kaplan, City Atty., Donald E. Wilson, Asst. City Atty., Denver, for defendants-appellees.

DUBOFSKY, Justice.

The Denver Center for the Performing Arts (DCPA) appeals from a district court judgment upholding the Denver Manager of Revenue's decision sustaining assessment of the Facilities Development Admissions Tax (admissions tax) against the DCPA for events in the Denver Center Theatre and the Denver Center Cinema. The DCPA maintains that the collection of the tax violates its contract and lease with the City and County of Denver (Denver) and that the tax violates the state and federal constitutional guarantees of equal protection. The district court determined that the DCPA lacked standing to bring this suit, but, to facilitate review, the district court also ruled against the DCPA on the merits. Although we conclude that the DCPA has standing, we affirm the judgment of the district court.

On October 16, 1973, the DCPA and Denver entered into a contract to construct and lease a performing arts center to be operated by the DCPA. Under the contract, the city was to purchase all the land for the center and construct a concert hall. The DCPA would raise $5,000,000 toward the construction of the concert hall. Denver then would lease the concert hall to the DCPA for nominal rent. The DCPA would construct other theaters and facilities on the remainder of the land purchased by the city, and these facilities also would be leased to the DCPA upon payment of nominal rent. The contract provides that legal title to all of the land, buildings and facilities would remain vested in the city. The DCPA would be "entitled to retain all revenues" from the center, and the DCPA's leases would be conditioned upon "the property, structures, facilities and appurtenances" remaining tax exempt and upon the facilities being maintained as public facilities.

In 1974, Denver passed the Facilities Development Admissions Tax ordinance, imposing a ten percent tax on admissions to all events at city-owned facilities, including "the new Performing Arts Center." Denver, Colo., Revised Municipal Code § 53–345(1) (1982). The ordinance requires that the vendor of admissions state the amount of the tax separately from the sale price on tickets, *id.* § 53–348(c), and forbids the vendor from absorbing the tax or advertising that it will absorb the tax, *id.* § 53–349.

On February 25, 1977, the DCPA leased from Denver the land for the Denver Center Theatre and Denver Center Cinema. Under the 1973 contract, the lease provides that the DCPA will construct a theater or theaters, and "be entitled to maintain all revenues" derived from those facilities. The lease also provides "that legal title to the building, or buildings, to be constructed ... shall be vested in the City" and that "[t]he said building, or buildings, when constructed, shall become the property of the City...." The city and the DCPA entered into another lease on December 16, 1977, for the use of the Boettcher Concert Hall, then under construction by the city. That lease provides that the DCPA "shall be entitled to retain all revenues ... except the Facilities Development Admissions Tax." The lease specifically requires the DCPA to collect the tax on admissions to performances in the concert hall.

The DCPA opened the Denver Center Theatre on December 31, 1979, and the Denver Center Cinema in April 1980. Early in 1981, the Denver Department of Revenue audited ticket sales for both the theater and the cinema. On January 21, 1981,

Denver assessed the DCPA $98,972.91, including tax, penalty and interest on admissions during the period from the opening of the theater and the cinema through December 1980. The DCPA filed a petition to review this assessment before the Manager of the Department of Revenue. On March 31, 1981, the Department of Revenue assessed the DCPA for admissions to the theater and cinema in the months of January and February 1981. The DCPA amended its petition for review to include the later assessment as well. The DCPA did not challenge the amounts of the assessments, which were based on the DCPA's audited records, but rather asserted that the DCPA should not be subject to the tax for events at the theater and the cinema.

After a hearing, the Manager of Revenue sustained both assessments against the DCPA. The Manager of Revenue found that the theater and the cinema were city-owned facilities upon which admissions taxes should be collected, that the provisions of the 1973 contract and the 1977 lease were not intended to exempt the DCPA from collecting taxes or to allow the DCPA to retain the taxes, and that the DCPA in fact did collect the taxes during the period covered by the assessment.[1] The manager also held that the admissions tax assessment did not violate any of the constitutional rights asserted by the DCPA.

The DCPA petitioned the district court for review of the Manager of Revenue's decision under C.R.C.P. 106(a)(4) and for declaratory judgment under C.R.C.P. 57. The district court held that the DCPA did not have standing to challenge the application of the tax because the DCPA had not shown any injury-in-fact from the tax. However, to facilitate appellate review, the court also ruled on the remaining issues in the DCPA's petition.

The district court refused to hear the petition for declaratory judgment under C.R.C.P. 57, holding that certiorari review under C.R.C.P. 106(a)(4) was adequate. As C.R.C.P. 106(a)(4) provides only for review of the administrative record, the court did not allow the DCPA to present any testimony or enlarge the record. After reviewing the record, the district court upheld the Manager of Revenue's findings that the 1973 contract and the 1977 lease did not exempt the DCPA from collecting the tax, and that the passage of the tax did not modify or impair the contracts. The court further held that the tax did not violate other constitutional guarantees of due process, equal protection or uniformity of taxation. The court also determined that there was no foundation in fact for the DCPA's claim that it did not have to collect the tax because the theater and the cinema were not city-owned. Therefore, the court upheld the manager's ruling under C.R.C.P. 106(a)(4), determining that the manager neither exceeded his jurisdiction nor abused his discretion.

The DCPA now appeals the decision of the district court on several grounds. The DCPA maintains that it has standing to challenge the assessment and that declaratory judgment under C.R.C.P. 57 is available simultaneously with certiorari review under C.R.C.P. 106. The DCPA further contends that the 1973 contract and 1977 lease unambiguously exempt it from collecting the tax or, in the alternative, that the contract should be so construed. The DCPA alleges that the assessment of the admissions tax violates federal and state constitutional guarantees against the impairment of the obligation of contracts and federal and state equal protection guaran-

---

1. Evidence supporting the manager's finding that the DCPA had collected admissions taxes included tickets to DCPA productions that state that the admissions tax is included, promotional literature sent to DCPA subscribers offering to absorb the admissions tax for early subscriptions (absorption of the tax is illegal under the ordinance, Denver, Colo., Revised Municipal Code § 53–349), tax returns filed by a sublessee of the Denver Center Theatre, and a rental agreement form used by the Denver Center Cinema that places responsibility for collecting and returning the admissions tax on the sublessee. Notwithstanding this finding, the DCPA has continued to maintain that it did not collect the tax.

tees. The DCPA's final argument is that the admissions tax does not by its terms apply to the Denver Center Cinema and Denver Center Theatre because these facilities are not owned by the city.

## I.

The first issue raised is whether the DCPA, as a collector of admissions taxes, has standing to protest the assessments made against it by the Denver Department of Revenue. Today we ruled in *Friends of Chamber Music v. City and County of Denver*, 696 P.2d 309 (Colo.1985), that Friends of Chamber Music, as a collector of the admissions tax, does not have standing to challenge the tax because the injury it alleged—that the admissions tax deprives it of property without due process of law— was not an injury to a legally protected right. Without readdressing the principles of standing outlined in *Friends of Chamber Music v. City and County of Denver*, we conclude in this case that the DCPA's allegations are sufficient to confer standing.

■ To determine whether the DCPA as a tax collector has standing to challenge the validity of the tax as applied to it, we need to consider whether the DCPA's allegations are sufficient under the two-part standing test of *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977): (1) whether the plaintiff has suffered actual injury from the challenged governmental action; and (2) whether the injury is to a legally protected or cognizable interest. The DCPA alleges that it is injured by both its current tax bill of over $100,000 and its potential future losses in patronage or revenue when it must either raise its ticket prices or receive a lower return thereon by deducting the tax from the price. As the DCPA maintains that it never collected the admissions tax from patrons of the theater or the cinema, the allegation that it will

have to pay $100,000 of its own funds meets the first part of the *Wimberly* test.[2] This allegation distinguishes the present case from *Wade v. State*, 97 Colo. 52, 55, 47 P.2d 412, 413 (1935), in which the tax collector was held to have no standing because it acknowledged that it had already collected the motor fuel tax from purchasers and then sought to avoid remitting the tax to the state. *See Friends of Chamber Music*, at 315.

■ The second part of the *Wimberly* test is met by the DCPA's contentions that the imposition of the admissions tax on events at the theater and the cinema is a violation of its contracts with Denver and that the admissions tax ordinance as applied to the theater and the cinema violates the impairment of contract clauses of the United States and Colorado constitutions. In addition, we have held that a court should look to the language of the statute in determining who has standing to challenge it, *Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission*, 620 P.2d 1051, 1058 (Colo.1980), and in *Friends of Chamber Music* we relied on the admissions tax ordinance, Denver Colo. Revised Municipal Code § 53–361 to –366 (1982), in determining that tax collectors/vendors have standing to challenge particular assessments under the ordinance. At 315. Here, the DCPA did not challenge the amount of the assessments although it utilized the agency procedure for challenging assessments.

■ Having determined that the DCPA has standing to assert its own rights in this litigation, we also must address its standing to make the claim that the ordinance violates the equal protection rights of patrons of municipal facilities. Usually, a litigant may not challenge a violation of a third party's constitutional rights; however, a party who has shown sufficient

**2.** The Manager of Revenue found that the DCPA actually had collected the admissions tax, so the DCPA would not pay the $100,000 assessment out of its own funds. We uphold that finding, *infra* p. 309, because there is substantial evidence in the record to support it. However, the

DCPA's standing is not affected by our ultimate conclusion that the DCPA did not suffer a $100,-000 loss. The allegation of the injury provides sufficient injury-in-fact to meet the first part of the *Wimberly* test.

personal injury-in-fact to confer standing on himself may assert a third party's rights in certain exceptional circumstances. In addition to his own interest, the litigant must demonstrate one or more of the following: a substantial relationship between the litigant and the third party; the difficulty or improbability that the third parties will ever assert their own constitutional rights; or the need to grant standing in order to avoid dilution of the third party's rights. *State Board for Community Colleges and Occupational Education v. Olson*, 687 P.2d 429, 435 (Colo.1984); *Augustin v. Barnes*, 626 P.2d 625, 628 (Colo. 1981).

■ We need not consider in this case the abstract proposition whether the DCPA has third party standing to assert the interests of its patrons because in *Friends of Chamber Music v. City and County of Denver*, where the plaintiffs included patrons of events held in municipal facilities, we held that the admissions tax does not violate the equal protection clause of the United States Constitution and the due process clause of the Colorado Constitution by taxing only those who attend events at city-owned facilities and not those who attend events at facilities owned by others. The DCPA seeks to raise the same question on behalf of its patrons; [3] there is no reason to address further either the standing of the DCPA to raise the question or the issue on the merits.

## II.

The DCPA next asserts error in the district court's holding that relief under C.R.C.P. 106(a)(4) was so complete as to preclude the DCPA's claim for declaratory judgment under C.R.C.P. 57. The DCPA maintains that a declaratory judgment is appropriate to determine the constitutional issues raised in its petition.

■ A claim under C.R.C.P. 57 is not precluded by the possibility of C.R.C.P. 106(a)(4) review of administrative agency action where C.R.C.P. 106(a)(4) review may be ineffective in addressing the issues raised by the petitioner. *Collopy v. Wildlife Commission*, 625 P.2d 994, 1004 (Colo. 1981); *Grant v. District Court*, 635 P.2d 201, 202 (Colo.1981); *Norby v. City of Boulder*, 195 Colo. 231, 236, 577 P.2d 277, 280 (1978); *see Bonacci v. City of Aurora*, 642 P.2d 4, 7 (Colo.1982). In particular, a declaratory judgment claim may be appropriate to address constitutional questions and challenges to the overall validity of a statute because C.R.C.P. 106(a)(4) allows only a limited review of whether an inferior tribunal exceeded its jurisdiction or abused its discretion. *Sullivan v. Board of County Commissioners*, 692 P.2d 1106 (Colo. 1984); *Two G's v. Kalbin*, 666 P.2d 129, 133 (Colo.1983); *City of Colorado Springs v. District Court*, 184 Colo. 177, 180, 519 P.2d 325, 327 (1974).[4] Claims for declaratory judgment and C.R.C.P. 106 review may be brought simultaneously in cases in which certain issues are not reviewable by certiorari. *Norby*, 195 Colo. at 237, 577 P.2d at 281.

■ In the present case, the DCPA challenged the constitutional validity of the tax ordinance. Each of the constitutional issues was briefed fully before the Manager of Revenue, and the manager's decision considers each of the issues.[5] Certiorari

---

3. The DCPA also argued on behalf of its patrons that the admissions tax violates article X, section 3 of the Colorado Constitution which provides in part: "All taxes shall be uniform upon each of the various classes of real and personal property located within the territorial limits of the authority levying the tax...." In *Deluxe Theaters, Inc. v. City of Englewood*, 198 Colo. 85, 596 P.2d 771 (1979), we held that the uniformity clause of article X, section 3 refers only to an ad valorem tax on property, not to taxes on occupations or privileges. The parties in the instant case agree that the admissions tax is an excise tax, a tax on a privilege.

4. C.R.C.P. 106(a)(4) allows relief only "[w]here an inferior tribunal ... has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy."

5. Although an administrative hearing officer, as here, may consider the facial constitutionality of a statute or ordinance and the hearing officer's decision on facial constitutional challenges may be reviewed on appeal, parties are not

review of the manager's decision in this case allowed the district court to consider also each of the constitutional issues. *See Snyder v. City of Lakewood,* 189 Colo. 421, 428, 542 P.2d 371, 376 (1975). The DCPA included no new issues in its petition before the district court. Therefore, although the DCPA appropriately raised constitutional issues in a declaratory judgment action, the district court acted within its discretion in dismissing the claim for declaratory relief under C.R.C.P. 57 because the review provided under C.R.C.P. 106(a)(4) was complete.

### III.

Several of the DCPA's claims stem from its contention that the terms of the 1973 contract and 1977 lease unambiguously exempt the Denver Center Theatre and Denver Center Cinema from any admissions tax imposed by the city. The DCPA further argues that if this exemption is not clear from the contract and lease, surrounding circumstances should compel the court to construe the contract in the DCPA's favor. We hold that the contract provisions allowing the DCPA to retain all revenues from the facilities and granting a tax exemption for the property leased by the DCPA are unambiguous, and the provisions do not limit the city's ability to impose an admissions tax on patrons of the facilities.

■ Interpretation of the language of a contract is a question of law to be resolved by the court. *Union Rural Electric Association v. Public Utilities Commission,* 661 P.2d 247, 251 (Colo.1983). "[W]hether ... a contract is ambiguous is also a question of law for the court." *People v. Johnson,* 618 P.2d 262, 266 (Colo.1980); *see Pepcol Manufacturing Co. v. Denver Union Corporation,* 687 P.2d 1310, 1314 (Colo. 1984). In determining whether the terms of a contract are ambiguous, a court must consider the ordinary meaning of the language, with reference to all parts of the

agreement. *Radiology Professional Corporation v. Trinidad Area Health Association,* 195 Colo. 253, 256, 577 P.2d 748, 750 (1978). The fact that the parties disagree as to the meaning of the terms of the contract does not lead necessarily to the conclusion that the contract is ambiguous. *Radiology Professional Corporation,* 195 Colo. at 256–57, 577 P.2d at 750; *Harrison Western Corporation v. Gulf Oil Co.,* 662 F.2d 690, 695 (10th Cir.1981). Extrinsic evidence may be admitted conditionally in order to determine whether a term of a contract is ambiguous. *KN Energy, Inc. v. Great Western Sugar Co.,* 698 P.2d 769 (Colo.1985); *Pepcol Manufacturing Co.,* 687 P.2d at 1314 n. 3. However, the plain effect of a contract should not be destroyed by strained construction. *American Industrial Leasing Company v. Costello,* 160 Colo. 588, 594, 418 P.2d 881, 884 (1966).

■ The plain meaning of the provisions of the 1973 contract and the 1977 lease entitling the DCPA to "retain all revenues" from the Denver Center Cinema and the Denver Center Theatre does not exempt the DCPA from collecting the admissions tax imposed upon patrons of these facilities. A private business generally does not include taxes collected when evaluating its income or revenue. If the phrase "all revenues" were interpreted to include the admissions tax, then the DCPA would be entitled to charge and retain that tax. The city probably cannot grant such power to a private entity. At any rate, this is a position that the DCPA has rejected consistently, arguing instead that the DCPA need not collect the tax at all. If the phrase "all revenues" does not include the admissions tax, then the city may require the DCPA to collect that tax and remit it to the city, as it is not a part of the DCPA's revenues. The DCPA has attempted to argue a middle position—that the phrase "all revenues" includes tax receipts, and therefore the DCPA need not

required to raise such constitutional issues in an administrative forum because the hearing officer's decision will not be considered authorita-

tive. *Industrial Commission v. Board of County Commissioners,* 690 P.2d 839, 844 n. 6 (Colo. 1984).

collect taxes for the city or may reimburse its patrons for any taxes collected. This mixed interpretation of the provision is not persuasive.

■ The cases cited by the DCPA in support of its contention involve the "revenues" of cities. *See, e.g., Public Market Co. of Portland v. City of Portland,* 171 Or. 522, 130 P.2d 624 (1942); *Bates v. Porter,* 74 Cal. 224, 15 P. 732 (1887). It seems an obvious proposition that tax receipts are a part of city revenues, and equally plain that the term "revenues" as used in business does not include the taxes collected for governmental entities. *See* Webster's New International Dictionary 1942 (3d ed. 1961). In fact, if tax receipts are a part of a city's revenues, and the business entity merely collects the taxes, it would seem contradictory to suggest that the tax receipts are part of the business entity's revenues as well.

■ None of the evidence presented by the DCPA to the Manager of Revenue leads to the conclusion that the phrase "all revenues" is ambiguous and should be interpreted in the manner suggested by the DCPA. The DCPA placed great weight on the fact that the Boettcher Concert Hall lease, entered into a few months after the Denver Center Cinema and Denver Center Theatre lease, specifically excluded the Facilities Development Admissions Tax from the revenues to be retained by the DCPA. This specific exclusion does not make the provision of the first contract ambiguous. Taxes collected for the city of Denver cannot be considered a part of the revenues to be retained by the DCPA without severely straining the language of the first lease. The language of the concert hall lease makes exclusion of the admissions tax from revenues explicit, but the fact that the additional clause was not included in the first lease does not change the meaning of the phrase "all revenues."

■ The second provision that the DCPA relies upon in claiming a tax exemption is the clause of the 1973 contract providing "that the property, structures, facilities and appurtenances under said leasehold interest shall be and remain tax exempt." The DCPA maintains that admissions to the facilities are "appurtenances" to the property leased by the DCPA. The word "appurtenances" has a technical meaning when used in conveyances of land. "Appurtenances" generally refers to intangible rights, such as water rights or easements, that necessarily must be conveyed for the beneficial use of the land. *See Cleary v. Skiffich,* 28 Colo. 362, 65 P. 59 (1901); *Thompson v. McKinney,* 91 Utah 89, 63 P.2d 1056 (1937); *see also Potter v. Hill,* 43 N.J.Super. 361, 128 A.2d 705 (1957). 49 Am.Jur.2d *Landlord and Tenant* § 197 (2d ed. 1970). The term occasionally may be used to refer to physical fixtures or improvements to land. 6 C.J.S. *Appurtenance* (1975); *see Hancox v. Peek,* 355 S.W.2d 568, 569 (Tex.Civ.App.1962); *Potter v. Hill,* 128 A.2d at 707; *Szilagy v. Taylor,* 63 Ohio App. 105, 25 N.E.2d 360, 361 (1939). The term also occasionally may convey an interest in physical fixtures that extend beyond the land but are necessary for the use of the land. *See Pine v. Gibraltar Savings Association,* 519 S.W.2d 238, 242 (Tex.Civ.App.1974) (water and sewer lines were appurtenances securing loan on land occupied by water and sewer plants); *see also Szilagy v. Taylor,* 63 Ohio App. 105, 25 N.E.2d 360 (portion of house accidentally built on neighboring land not conveyed as appurtenance to neighboring land).

■ The DCPA proposes that the term "appurtenances" as used in the contract should include the transactions conducted by the DCPA in admitting patrons to the theaters. "Appurtenances" generally does not refer to transactions on land, and the DCPA presented no evidence that the term was meant to refer to these transactions in the lease. In the context of the phrase "property, structures, facilities and appurtenances," the term "appurtenances" takes its usual technical meaning of improvements to or property rights associated with the land conveyed. This phrase therefore assures that the property leased by the DCPA will not be taxed, but pro-

vides no exemption for transactions taking place on the property.

 The provisions of the 1973 contract and 1977 lease cited by the DCPA do not provide an explicit exemption from the admissions tax for the Denver Center Theatre and Denver Center Cinema. Although the sovereign power to tax may be abrogated by contract, "[e]very reasonable doubt should be resolved against [such restraint]. Where it exists it is to be rigidly scrutinized, and never permitted to extend, either in scope or duration, beyond what the terms of the concession clearly imply." *County Commissioners v. Colorado Seminary,* 12 Colo. 497, 500, 21 P. 490, 500 (1889) (*quoting Tucker v. Ferguson,* 89 U.S. (22 Wall.) 527, 22 L.Ed. 805 (1874)). We will not construe a contract to provide an exemption from taxation if an exemption has not been granted explicitly. Because the agreements between the city and the DCPA do not provide the DCPA with an exemption from collecting the admissions tax, the DCPA's claim that the tax ordinance violates the impairment of contract clauses of article I, section 10(1) of the United States Constitution and article II, section 11 of the Colorado Constitution has no foundation.

### IV.

The DCPA next asserts that the city should be estopped from collecting the admissions tax for 1980 because of the delay between the signing of the 1977 lease and the DCPA's receipt of the first tax assessment in 1981. However, the Denver Center Theatre had been in operation only for one year and the Denver Center Cinema for eight months at the time that the city audited the DCPA's receipts and assessed the tax. The tax ordinance provides a three year period during which vendors must maintain their sales records for audit by the Manager of Revenue. Denver,

Colo., Revised Municipal Code § 53–530 (1982). In addition, the Denver supervisor of sales, use and occupational taxes had written a letter to the executive director of the DCPA on April 5, 1978, informing him that all events would be presumed subject to the admissions tax.[6]

 The DCPA has not established the elements of estoppel by delay: that Denver had full knowledge of the facts, that Denver delayed unreasonably in asserting its rights, and that the DCPA relied on and was prejudiced by this delay. *See Manor Vail Condominium Association v. Town of Vail,* 199 Colo. 62, 64, 604 P.2d 1168, 1170 (1980); *see also Genua v. Kilmer,* 37 Colo.App. 365, 368, 546 P.2d 1279, 1281 (1976). Denver did not have full knowledge of the amount owed by the DCPA until it conducted an audit. The delay—at most one year in conducting an audit of the first month's transactions for the theater—was not unreasonable. Any reliance by the DCPA on a delay of less than one year in assessing the taxes owed was not reasonable under an ordinance that allows a three year period for audits by the Manager of Revenue, especially in light of the revenue department's letter to the director of the DCPA. In addition, the Manager of Revenue specifically found in his decision and order that the DCPA had been collecting the taxes. This is an administrative finding of fact that must be upheld on review under C.R.C.P. 106(a)(4) because there is competent evidence supporting it in the record. *Civil Service Commission v. Doyle,* 162 Colo. 1, 6, 424 P.2d 368, 371 (1967). If the DCPA collected taxes throughout the period for which they were assessed, the delay in assessment inflicted no harm. In any case, an error in the administration of the taxing ordinance does not estop the agency from later collecting the taxes due. *See Beery v. American*

---

**6.** The ordinance exempts events at municipal facilities from the admissions tax if there is no charge for admission, if the performers are not paid, if the sales are to or by governmental or charitable organizations or if the federal or state constitutions prohibit the tax. Denver, Colo., Revised Municipal Code § 53–347 (1982).

*Liberty Insurance Co.,* 150 Colo. 499, 503, 375 P.2d 93, 96 (1962). Even if Denver erred in waiting a year to assess the past due taxes, that error does not prevent the city from collecting the taxes due under the ordinance.

### V.

◼ The ordinance imposes the admissions tax only on events "at any facility owned by the City." Denver, Colo., Revised Municipal Code § 53–345(1) (1982). The DCPA asserts that the tax should not be imposed on events at the Denver Center Theatre and Denver Center Cinema because the facilities are not owned by Denver. The assertion that the facilities are not owned by Denver directly contradicts the provisions of the 1973 contract and the 1977 lease that vest title to both the land and the facilities in the city. At the hearing before the Manager of Revenue, the DCPA elicited testimony from an abstractor for a title insurance company to the effect that the city owned the title to the land but the DCPA owned the title to the theater buildings. The manager and the district court correctly rejected this testimony. In this case, there is a specific provision in the agreements between the parties that the title to the improvements would vest in the city. The agreements made the improvements city-owned facilities for the purposes of the taxing ordinance.

The judgment of the district court is affirmed.