## The THREE G CORPORATION, Plaintiff-Appellant,

v.

### George N. DADDIS, Defendant-Appellee,

and

### Takis D. Daddis, Defendant-Appellant.

### No. 84CA0838.

Colorado Court of Appeals, Div. II.

Jan. 9, 1986.

Irvin M. Kent, Aurora, for plaintiff-appellant and defendant-appellant.

Lahey & Burns, William R. Lahey, Belmore T. Martin, Denver, for defendant-appellee.

STERNBERG, Judge.

Plaintiff, The Three G Corporation (Three G), brought suit against defendant, George N. Daddis (George), its former president and controlling shareholder, to recover damages and certain real property on the theory that George's purchase of the property constituted a wrongful diversion of a corporate opportunity. George asserted a counterclaim against Three G seeking payment of back wages and joined defendant Takis D. Daddis (Takis), Three G's former secretary and minority shareholder, asserting several crossclaims against him.

Following trial to the court, judgment was entered in favor of George on Three G's claims, and in favor of Three G and Takis on George's counterclaim and crossclaims. The trial court awarded attorney fees to George, finding that Three G's action was frivolous and groundless because the parties had executed a mutual release four months prior to filing, but refused to award attorney fees to Three G and Takis for defense of George's counterclaim and crossclaims. Three G and Takis appeal. We affirm in part and reverse in part.

The pertinent facts, as found by the trial court on conflicting evidence, are as follows. In 1975, George, in response to family requests, agreed to help Takis, his nephew, get into the restaurant business, and in the fall of 1975, negotiations for the purchase of a restaurant for $148,000 were commenced and thereafter consummated.

The purchase was financed through George's wholly owned corporation, the 1575 Corporation, which obtained a $60,000 loan secured by property owned by it. The 1575 Corporation then loaned the money to Three G on an unsecured basis, and 510 shares of Three G stock were issued to George and 490 shares to Takis. Additional obligations of the restaurant were assumed by Three G, and the seller carried the balance of the purchase price.

The restaurant, which was situated on land owned by third persons, was subject to a long-term lease which gave Three G the right to submit a bid to purchase the property within thirty days after receipt of notice of intent to sell. If Three G's bid was equal to or greater than bids submitted by others, the landlord was prohibited from selling to anyone other than Three G.

In early 1976, two weeks after closing on the restaurant, George and Takis received notice of intent to sell the underlying property from an attorney representing one of its owners. George and Takis discussed the possibility of Three G's purchase, but Takis indicated that he had no money to invest, had no desire to borrow more money, and had no interest in being involved in the purchase of the property. A formal vote of the board of directors, which consisted of George, Takis, and an outside director, was not taken, and Three G made no bid. In late 1976, George, unwilling to obtain a personal loan to enable Three G to purchase the property, bought the property in his individual capacity.

The combination of Takis' management and George's business acumen quickly led to the financial success of the restaurant and to satisfaction of the obligations incurred in its purchase. However, in late 1980, a serious dispute arose between George and Takis culminating in a special meeting of Three G's board of directors, called by George, for the purpose of discharging Takis as manager.

Pursuant to the advice of counsel, Takis sought a temporary restraining order and filed a complaint to enjoin George's pro-

posed action. Before ruling on the motion, the trial court encouraged George and Takis to arrive at an amicable settlement of their differences because of the familial nature of the claims.

On February 19, 1981, George, Takis, and Three G entered into a settlement agreement which provided, among other things, for the purchase of George's stock by Takis and an increase in rent to be paid to George. Although the settlement agreement contained a "hold harmless" clause, Three G initiated this action in June 1981, asserting for the first time usurpation of corporate opportunity.

### I.

In essence, Three G challenges the trial court's findings and conclusions as being adverse to its view of what they should have been, arguing that the trial court applied incorrect legal standards as to the usurpation of corporate opportunity claim. We disagree.

■ An officer of a corporation is duty bound to purchase property for the corporation, or to refrain from purchasing property for himself, if the corporation has an interest, actual or in expectancy, in the property or if the purchase of the property by the officer or director may hinder or defeat the plans and purposes of the corporation's legitimate business. *Carper v. Frost Oil Co.*, 72 Colo. 345, 211 P. 370 (1922). However, a corporate director or officer owes no specific duty to use or pledge his personal funds to enable the corporation to take advantage of a business opportunity. *A.C. Petters Co. v. St. Cloud Enterprises*, 301 Minn. 261, 222 N.W.2d 83 (1974); *Canion v. Texas Cycle Supply, Inc.*, 537 S.W.2d 510 (Tex.Civ.App.1976). If the plaintiff establishes a corporate interest or expectancy, *Colorado and Utah Coal Co. v. Harris*, 97 Colo. 309, 49 P.2d 429 (1935), the determination whether there has been a breach of the director's or officer's duty to act for the corporation is a question of fact for the trier of fact. *Bator v. Mines Development, Inc.*, 32 Colo. App. 320, 513 P.2d 220 (1973).

■ Here, the evidence showed that although Three G had a contractual right to bid on the property in the event of sale, purchase of the property was not within the expectation of Three G. Instead, it showed that Three G did not intend to acquire the property because of its financial condition. From these facts, which are supported by the record, the trial court could properly conclude that no duty owed by George to Three G had been breached. *See Bator v. Mines Development, Inc., supra.*

### II.

Three G also contends that the trial court erred in finding that the hold harmless clause contained in the settlement agreement was intended by all parties to be a mutual release, arguing that the trial court improperly relied upon extrinsic evidence. Because the award of attorney fees to George was premised on this conclusion and is being challenged on appeal, we must review the propriety of the trial court's construction of the hold harmless clause.

The settlement agreement, which was executed by George and Takis in their individual capacities and by Three G through its president, George, provides:

"The parties to this agreement stipulate and agree to hold each other harmless *for any and all claims of whatever nature arising out of any acts of [Three G]* committed or taken by [Three G] during the period beginning six years before the date of this Settlement Agreement and continuing into the future indefinitely. It is further agreed that in return for the payment of $37,000 and the execution of a promissory note ... [George] agrees to waive and release any and all claims against [Takis] for any money owed to him individually." (emphasis added)

■ Interpretation of the language of a contract is a question of law to be determined by the court. *Denver Center for Performing Arts v. Briggs*, 696 P.2d 299 (Colo.1985). The intent of the parties to a

contract must be determined from the language of the document itself; it may only be proven by extrinsic evidence if an ambiguity in the terms of the agreement exists. *Radiology Professional Corp. v. Trinidad Area Health Ass'n*, 195 Colo. 253, 577 P.2d 748 (1978). However, the parties' disagreement as to the meaning of the contractual terms is not necessarily indicative of ambiguity. *Denver Center for Performing Arts v. Briggs, supra; Radiology Professional Corp. v. Trinidad Area Health Ass'n, supra.*

■ Construing the language of the hold harmless clause in harmony with the plain and generally accepted meaning of the words employed and in reference to all the provisions of the settlement agreement, we conclude that it was not intended to be a mutual release. *See Radiology Professional Corp. v. Trinidad Health Ass'n, supra.* Rather, the clear intendment of the provision was to preclude litigation of future claims arising from Three G's acts. Therefore, this action, which arises from George's purchase of the leasehold property, does not fall within the ambit of the hold harmless clause.

This determination obviates the basis of the trial court's award of attorney fees to George under Colo.Sess.Laws 1977, ch. 189, § 13–17–101 at 795–796. There being no other evidence of record tending to show that the bringing or maintaining of the action was frivolous or groundless as defined in *Western United Realty, Inc. v. Isaacs*, 679 P.2d 1063 (Colo.1984), we hold that an award of attorney fees to George for defense of the action is improper as a matter of law.

### III.

Finally, Three G and Takis contend that the trial court erred in refusing to award them attorney fees for defense of George's counterclaim and crossclaims. They argue that they are entitled to attorney fees because George did not present evidence in support of these claims. We find no error.

■ Although a trial court may find that a claim is groundless if the proponent of the claim fails to present evidence in support thereof, *Fountain v. Mojo*, 687 P.2d 496 (Colo.App.1984), it still must exercise its discretion in determining whether an award of attorney fees is warranted. *International Technical Instruments, Inc. v. Engineering Measurements Co.*, 678 P.2d 558 (Colo.App.1983). Under the circumstances here, we conclude that the trial court did not abuse its discretion in refusing to award Three G and Takis attorney fees.

■ The trial court entered judgment in favor of Three G and Takis on George's counterclaim and crossclaims finding that no evidence in support thereof was adduced. However, its denial of attorney fees was predicated on its findings that George was entitled to assert such claims, that the claims were warranted by the complaint, and that the claims did not exceed those commonly filed in response to such a complaint. While the trial court's findings are not a model of clarity or precision, they are tantamount to a determination that the counterclaim and crossclaims were not groundless in spite of George's failure actively to pursue the same at trial and that such failure did not rise to the level of bad faith. *See Western United Realty, Inc. v. Isaacs, supra.* We will not disturb the trial court's exercise of discretion on review where, as here, it finds support in the record. *See International Technical Instruments, Inc. v. Engineering Measurements Co., supra.*

The judgment awarding attorney fees to George is reversed. The judgment is affirmed in all other respects.

SMITH and BABCOCK, JJ., concur.