In the Matter of **CONTINENTAL AIRLINES, INC., et al.,** Debtors.

**Bankruptcy Nos. 90–932 to 90–984.**

United States Bankruptcy Court, D. Delaware.

Feb. 4, 1992.

Daniel E. Muse, City Atty., Alice J. Fischer, Asst. City Atty., Denver, Colo., Jeoffrey L. Burtch, Wilmington, Del., for Manager of Revenue of the City and County of Denver.

Frances A. Koncilja, Thomas H. Steele, Mark E. Haynes, Denver, Colo., William H. Sudell, Jr., S. David Peress, Wilmington, Del., for debtors.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

The Manager of Revenue for the City and County of Denver (Denver or Manager) has brought this motion for payment of an administrative expense claim for unpaid use tax, penalties and interest. 11 U.S.C. §§ 503(a), (b)(1)(B)(i) and (C). Continental Airlines, Inc. opposes payment of the administrative claim on the grounds that Continental is entitled to an exemption for the period at issue. Den.Rev.Mun.C. § 53–97(17); 11 U.S.C. § 505(a)(1). Continental has cross-moved for a refund or credit for taxes already paid while the exemption was in effect. 11 U.S.C. § 505(a)(2)(B)(ii). This is a core proceeding under sections 157(b)(2)(B) and (C) of Title 28.

For the reasons that follow Denver's motion is denied and Continental's cross-motion is granted.

### I. *Background*

Continental operates a large commercial airline hub at Stapleton International Airport, approximately 15 miles north of Denver, Colorado. Continental leases more than one million square feet and employs more than 6,000 people at Stapleton. Among the buildings and areas occupied are airplane hangars, terminal concourses, ticket counters and office space.

Continental purchases supplies such as aviation fuel, spare parts, and tools to operate its hub. Most of the parts and tools come from out-of-state suppliers. Denver has enacted use tax ordinances applicable to purchases of personal property (including airline fuel, parts and tools) out-of-state for use in-state. Den.Rev.Mun.C. § 53–96. Unlike sales tax, which is collected by the seller, the buyer must file a use tax return on the 20th of each month for purchases made the preceding month. Den.Rev. Mun.C. § 53–98(i).

In early 1991 the Denver council enacted an exemption to the use tax ordinance. The ordinance exempted sales of personalty "to be used, consumed, stored, or distributed at a facility ... (b) that contains at least one million square feet of useable floor space and (c) that serves as a ... regular place of reporting for duty for at least two thousand employees." Denver Ordinance No. 75, Series of 1991, effective February 1, 1991, Den.Rev.Mun.C. § 53–97(17) (the February exemption or Ordinance No. 75). (A parallel provision, not relevant here, was enacted for sales tax.)

Continental filed its use tax return as usual until June of 1991 when it determined it was entitled to the February exemption and began withholding the tax. Den.Rev.Mun.C. § 53–49. The exemption was claimed for the period May 1—August 8, 1991, when the February exemption was repealed and replaced with an amended exemption. Ordinance No. 568, §§ 1–4, Series of 1991, (effective August 9, 1991), Den. Rev.Mun.C. § 53–97(16) (revised) (August amendment or Ordinance No. 568). The parties agree Continental is not entitled to the exemption after August 9, 1991.

The partial payment of the use tax during the period the February exemption was in effect has effected a procedural bifurcation of the tax issue, though the underlying issue of entitlement to the exemption remains the same. The Manager of Revenue has assessed Continental $1,494,194.00 for the period the disputed tax was withheld, plus additional penalties and interest ($190,-680.25 as of 9/21/91). Continental has filed for a credit or refund of the tax it believes it has mistakenly paid.

On July 19 Continental filed a Claim for Refund of the March and April overpayments in the amount of $795,137.13. Den.Rev.Mun.C. § 53–111. The Claim for Refund was denied by the Denver Department of Revenue. Continental also filed amended returns for the months of February, March and April on July 19, September 4 and September 27, 1991, respectively. An affirmative finding for Continental on the amended returns would result in a credit (not a refund) to the estate in the amount of $1,259,271.58. Continental has preserved its right of appeal to the Denver District Court from the Department of Revenue's final assessment for the period

May 1—August 8, 1991. Den.Rev.Mun.C. § 53–124.

The Manager filed its motion for payment of an administrative expense in this court on August 16, 1991, based on its final assessment of the May and June use taxes owed. An amended motion covering all unpaid use taxes (plus penalties and accruing interest) was filed October 4, 1991. Continental filed its opposition and cross-motion for a determination of use tax overpaid for the period February 1—April 30, 1991. A hearing was held October 24, 1991.

## II. *Jurisdiction*

■ The first issue the court must resolve is whether it has jurisdiction to determine the amount of Continental's tax liability and right to a refund. Just as the analysis of Continental's tax liability or entitlement to a refund is procedurally distinct under Denver law, the jurisdictional analysis under the Bankruptcy Code also varies with the claim. Both sides wish a determination of Continental's tax liability for the period May 1—August 8, 1991. 11 U.S.C. § 505(a)(1). Continental alone argues that this court's jurisdiction extends to a determination of the estate's right to a refund for the period February 1—April 30, 1991 as well. 11 U.S.C. § 505(a)(2)(B).

The Bankruptcy Code provides a broad grant of authority to determine tax liability:

§ 505. Determination of tax liability.

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

"[S]ection [505(a)] contemplates the normal situation where a tax liability issue arises with respect to a debtor." *Quattrone Accountants, Inc. v. I.R.S.*, 895 F.2d 921, 925 (3d Cir.1990) (finding jurisdiction even though third party sought determination of debtor's tax liability). The section

is interpreted broadly; "the parameters of a bankruptcy court's jurisdiction over the subject matter of federal and state income taxation under 11 U.S.C. § 505(a)(1) corresponds with general principles governing a bankruptcy court's power to adjudicate at least core matters under 28 U.S.C. § 157." *Unsecured Creditors' Committee of Goldblatt Bros., Inc. v. I.R.S. (In re Goldblatt Bros., Inc.)*, 106 B.R. 522, 529 (Bankr. N.D.Ill.1989). *See also Michigan Employment Security Comm'n v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1138 (6th Cir.1991) (bankruptcy courts have jurisdiction to determine the amount and legality of unemployment compensation taxes incurred by debtors).

The broad grant of jurisdiction to determine the debtor's tax liability is only withdrawn if there has been a prior adjudication of the tax pre-petition by a court of competent jurisdiction. 11 U.S.C. § 505(a)(2)(A). Since the use tax dispute arose post-petition, this exception is not relevant. Therefore the court may determine the amount of Continental's tax liability.

Denver argues that the court must stop there. It contends that this court does not have jurisdiction because the refund was not "properly request[ed]." 11 U.S.C. § 505(a)(2)(B)(i). Among the arguments were whether Denver followed the mailbox rule, accepted facsimile signatures, or received the first claim on July 19, 20 or 21.

■ There is a separate limit on the court's jurisdiction to determine the right of the estate to a refund:

(2) The court may not so determine—

\* \* \* \* \* \*

(B) any right of the estate to a tax refund, before the earlier of—

(i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or

(ii) a determination by such governmental unit of such request.

11 U.S.C. § 505(a)(2)(B). One of the alternate preconditions must be satisfied before the bankruptcy court may take jurisdiction over refunds. The section mandates wise use of judicial resources: if the governmental unit were to grant a refund, the determination by the bankruptcy court would be unnecessary. The sections are in the alternative; proper filing is irrelevant to the latter provision.

The court finds that proper filing of a claim for refund is only relevant to this court's jurisdiction under section 505(a)(2)(B)(i). Since Denver has already denied Continental's claim, the court may take jurisdiction to determine the amount of refund under section 505(a)(2)(B)(ii).

■ Having found that this court may take jurisdiction, the question remains whether it should. One of the few courts to address the issue of when the bankruptcy court should exercise its jurisdiction under section 505(a) provided a framework for the analysis:

> The analysis necessarily includes balancing the Bankruptcy Court's need to administer the bankruptcy case in an orderly and efficient manner, the complexity of the tax issues to be decided, the asset and liability structure of the debtor, the length of time required for trial and decision, judicial economy and efficiency, the burden on the Bankruptcy Court's docket, prejudice to the debtor and potential prejudice to the taxing authority responsible for collection from inconsistent assessments.

*In re Hunt,* 95 B.R. 442, 445 (Bankr. N.D.Tex.1989).

One of the overwhelming points in favor of taking jurisdiction is that there has already been a full trial in this court, whereas the Debtor's petition for refund and exemption claim are slowly making their way through the Denver administrative appeals process (which itself is the subject of litigation). Both sides welcomed the relative speed in which the issue could be resolved here. Accordingly, a substantial amount of time and effort has been devoted to this proceeding.

As to the complexity of the tax issues involved, they are relatively slight. In all likelihood the outcome will turn on the definition of "facility" under Colorado law. A bankruptcy judge is accustomed to applying state law under many sections of the Code. *See, e.g.,* 11 U.S.C. §§ 541(c)(2); 546(b).

The potential prejudice to the taxing authority is not great, considering that the February exemptions were only in effect six months and would not apply to many other taxpayers (if any). Therefore, there is little risk of inconsistent results.

Finally, judicial economy and efficiency dictates prompt resolution of this matter which has already been tried. If the court did not have jurisdiction over the refund as well, the result may well have been different. But considering all the facts and circumstances of these motions, the court will exercise its discretion to take jurisdiction to determine the legality and amount of Denver's tax claim, and the estate's right to a refund.

### III. *The Denver Ordinances*

Since the court has taken jurisdiction, it must now decide whether Continental qualifies for the February exemption to the Denver use tax, and if it does, whether the August amendment changes that result. Denver argues first that the statute must be narrowly construed against the taxpayer. Second, the common meaning of facility is a single building. Finally, even if Continental appeared to qualify for the February exemption, the August amendment clarified who was entitled to claim the exemption, leaving Continental out. Continental replies that it has met its burden of showing its operation at Stapleton qualifies for the exemption, and the August amendment does not change that result. To the extent the later bill attempts to take away the exemption from those who originally qualified, it is unconstitutional. The court agrees that Continental has met its burden of proof on the exemption and that subsequent retroactive "clarification" is not controlling over the plain language of the original February enactment.

## A. *The February Exemption*

■ The original ordinance exempted:

Sales of tangible personal property to a transportation utility to be used, consumed, stored, or distributed at a facility—

(a) located within an enterprise zone in the city designated as such pursuant to state law

(b) that contains at least one million (1,000,000) square feet of useable floor space and

(c) that serves as a headquarters or regular place of reporting for duty for at least two thousand (2,000) employees in the third year of operations of the facility and continually thereafter.

Denver Ordinance No. 75, Series of 1991, effective February 1, 1991, Den.Rev. Mun.C. § 53–97(17) (the February exemption or Ordinance No. 75).

The parties have stipulated to the following relevant facts. Continental is a "transportation utility." Stapleton is located in an "enterprise zone." Denver announced in its opening statement that it would stipulate to the fact that Continental leases one million square feet or more of usable floor space at Stapleton but if the footage that is not actually utilized by Continental (whether because it is occupied by a sublease or simply vacant) is subtracted the area falls below one million square feet. Transcript of Proceedings, p. 108 at lines 4–18 (Oct. 24, 1991). Finally, Continental has two thousand or more (on the order of six thousand) employees who report to work at Stapleton, but not to a single building.

Basically the key to construction of the February exemption is the term "facility." If it can only refer to a single building then the square footage and employee reporting requirements must be satisfied by a single structure. On the other hand, if "facility" means a group of buildings, then the square footage and employees may be summed over all buildings that comprise the facility.

Denver argues that the term "facility" means a single enclosed building, and that the town council only intended to provide the exemptions to *new* facilities such as the

one under construction by United Airlines at the new Denver airport. Since Continental does not have a single enclosed 1 million square foot building to which 2,000 or more employees report (Stipulation of Facts, No. 4), it does not qualify for the exemption. Continental replies that "facility" normally includes one or more buildings. It qualifies under the plain language of the exemption and additional qualifications should not be read into the statute.

■ A statute granting a tax exemption is subject to special rules of statutory construction. The exemption is strictly construed against the taxpayer. *Atlantic Coast Line Railroad Co. v. Phillips*, 332 U.S. 168, 172, 67 S.Ct. 1584, 1586, 91 L.Ed. 1977 (1947); *Denver Center for the Performing Arts v. Briggs*, 696 P.2d 299, 308 (Colo.1985). The taxpayer bears the burden of proof that it qualifies by clear and convincing evidence. Den.Rev.Mun.C. § 53–11.

■ The starting point for construction of Ordinance No. 75 is the recognition that Denver is a home rule municipality organized under the Colorado constitution. As such, local ordinances "supersede within the territorial limits and other jurisdictions of such city or town any law of the state in conflict therewith." Colo. Const., art. XX, § 6. Denver sales and use tax provisions supersede conflicting state tax statutes. *Security Life v. Temple*, 177 Colo. 14, 492 P.2d 63 (1972). Of course, the local ordinance must still comport with Colorado constitutional requirements. *Cherry Hills Farms v. City of Cherry Hills*, 670 P.2d 779 (Colo.1983).

Controlling Colorado law requires that the court "first look to the language of the statute." *City of Littleton v. County Com'rs*, 787 P.2d 158, 161 (Colo.1990) (citation omitted). "Words and phrases shall be read in context and construed according to the rules of grammar and common usage." Colo.Rev.Stat.Ann. § 2–4–101 (1991). Only if the statutory language is ambiguous does the court consider the legislature's intent and purpose, as expressed through

the legislative history, preamble and bill title. *City of Littleton*, 787 P.2d at 161.

The Denver chapter governing use and sales tax does not define facility. Denver has helpfully cited Webster's definition of facility for the court: "something (as a hospital, machinery, plumbing) that is built, constructed, installed or established to perform some particular function or to serve a particular purpose." *Webster's Third New International Dictionary*, unabridged, p. 812–13 (1981). As Continental points out, the example given, hospital, is often comprised of a number of buildings. The essence of the definition is collection of objects assembled for a purpose; the common purpose unites the pieces. The facility consists of whatever it takes to accomplish the purpose for which the facility exists.

It would appear that Continental's facility at Stapleton consisting of hangars, warehouse, cargo buildings, terminal concourses, ticket counters and office space all relate to its operation as a transportation utility. Employees report to various areas throughout the facility, and all are engaged in effecting the smooth operation of the airline at Stapleton.

This definition comports with that given in the Colorado tax statute that governs enterprise zones:

> "Facility" means any factory, mill, plant, refinery, warehouse, feedlot, building or *complex of buildings* located within the state, including the land on which such facility is located and all machinery, equipment, and other real and tangible personal property located at or within such facility *and used in connection with the operation of* such facility.

Colo.Rev.Stat. § 39–22–508.2(2)(a) (emphasis added).

Although not controlling, the state definition provides guidance in the absence of a definition in the Denver Code. As with Webster's definition, the touchstone is the *use* in connection with the operation of the facility.

■ A major airport hub, operated for the purpose of transporting passengers and cargo, naturally consists of multiple buildings and areas, all of which are necessary to the operation of the facility. As discussed in the Background, Continental leases counter space, concourses, warehouses and a flight kitchen, among other buildings. In the absence of a controlling definition in the Denver Revised Municipal Code, the court must rely on the common meaning. Colo.Rev.Stat.Ann. § 2–4–101 (1991). In common usage, the term "facility" as applied to a "transportation utility," or major airport hub, would include all the areas of activity at the airport which are used in connection with operating the airline. Therefore the square footage of all the leased areas may be summed, and the fact that Continental's six thousand employees report to multiple areas at Stapleton is irrelevant.

Denver argues that the total area Continental leases does not "contain" at least one million square feet because some of the area is vacant, and other areas are subleased. Forty-six thousand square feet leased by Continental is occupied by its inflight food service subsidiary Chelsea Catering Corporation. The fact that Chelsea has been set up as a separate entity is not relevant when it is Continental who leases the space and pays the bills. Similarly, the fact that forty-three thousand square feet in terminal and concourse D are empty is irrelevant to whether or not Continental's Stapleton facility "contains" one million square feet of usable floor space. The only sensible meaning of "contain" in this context is lease rather than physically occupy every square foot.

Since Denver stipulated to the lease of at least one million square feet of usable floor space, and the court rejects Denver's contention that the empty areas and the area occupied by Chelsea must be discounted in calculating total area, Continental has met its burden of proof that its facility contains at least one million square feet of useable floor space. Denver has also stipulated that Stapleton is a defined "enterprise zone" and that Continental has at least two thousand employees who report to work at Stapleton. Therefore, Continental has met its burden of proof on all requirements in Ordinance No. 75; it is entitled to claim the

February exemption. The question remains whether the August amendments change that result.

## B. *The August Amendments*

■ On August 9, 1991, the February exemptions were repealed and new exemptions passed in their place.

(16) Sales of machinery, tools, and equipment, including replacement parts, to a transportation utility to be used in the operation of an equipment maintenance facility and at an industrial building—

(a) that is located in the city within an enterprise zone designated as such pursuant to state law;

(b) that contains at least one million (1,000,000) square feet of enclosed, useable floor space on a single level;

(c) that serves as a regular place of work and as a regular place for reporting for duty for at least two thousand (2,000) employees of the utility in the third year of operations of the maintenance facility and continually thereafter; and

(d) that is operated by an interstate carrier for hire primarily for maintaining, rebuilding, or repairing equipment moving in interstate commerce.

Ordinance No. 568, §§ 1–4, Series of 1991, (effective August 9, 1991), Den.Rev.Mun.C. § 53–97(16) (revised) (August amendment or Ordinance No. 568). Section 4 of the new bill makes the amended use tax exemption retroactive to February 1, 1991. The parties agree Continental does not qualify for the use tax exemption after August 9. They disagree on what retroactive effect the August amendment has on the February exemption before August 9, 1991.

The Colorado Bill of Rights does not permit retroactive legislation: "No *ex post facto* law, nor law ... retrospective in its operation, ... shall be passed by the general assembly." Colo. Const., art. II, § 11. "[A] retrospective law embraces a statute which abrogates an existing right of action or defense, or creates a new obligation on transactions or considerations already

past." *California Co. v. Colorado,* 141 Colo. 288, 348 P.2d 382, 399 (1959) citations omitted, *app. dismissed,* 364 U.S. 285, 81 S.Ct. 42, 5 L.Ed.2d 37 (1960). This rule is applied in tax cases as well: "[a] very serious question of constitutionality would arise if the revenue measure was construed to mean that it worked retrospectively." *Id.*

However, the Colorado Supreme Court has upheld the constitutionality of a state tax statute retroactively varying the method of property valuation for tax purposes. *Martin v. Board of Assessment Appeals,* 707 P.2d 348 (Colo.1985). "[P]roperty owners have no vested right to have their taxable property assessed by particular methods employed in prior years." *Id.* at 352 (citing *American Refrigerator Transit Co. v. Adams,* 28 Colo. 119, 63 P. 410 (1900) in which the Colorado Supreme Court upheld a new tax valuation method for already taxable railroad cars). "Since the statute only alters the factors which may be considered in determining actual value, it does not impair the taxpayers' vested rights, and therefore is not unconstitutionally retrospective in its operation." *Id.*

A statute is applied retroactively if it "takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability, with respect to transactions ... already past." *Van Sickle v. Boyes,* 797 P.2d 1267, 1270–71 (Colo.1990). The court agrees with the debtor that the attempt to retroactively repeal the exemption would "attach a new disability [the use tax] with respect to transactions already past" [the out-of-state purchase of personalty for use in Denver].

The bill repealing the February exemption and enacting the August amendments contained a preamble, also in dispute:

WHEREAS, the Council, by enacting [Ordinance No. 568] into law expresses and reaffirms its understanding that no facility, building, or enclosed structure or group of such facilities, buildings, or enclosed structures currently, as of the date of this enactment, and at all times prior thereto meets the eligibility criteria

established for the exemptions granted by Ordinance No. 75, Series of 1991 . . . . Basically the preamble is a retrospective statement of legislative intent. But legislative intent is only relevant to the extent the plain language or the Ordinance is unclear or ambiguous. *City of Littleton*, 787 P.2d at 161. Since the court has interpreted the plain language of the February exemption by the common meaning rule, resort to legislative intent is unnecessary.

■ Denver argues that the August amendment is not a retroactive bill so much as a retroactive *clarification* of past bills. In fact the title of the August amendment makes this clear:

> A bill for an ordinance repealing Ordinance No. 75, Series of 1991, and reenacting subsections (16) and (17) of Section 53–97 of the Revised Municipal Code *in order to clarify the exemption* from the use tax relating to maintenance facilities located in enterprise zones.

However, the Denver Revised Municipal Code provides "the headings and catchlines are intended as mere catchwords to indicate the content of sections, and shall not be deemed or taken to be a part of the sections in any substantive sense whatever." Tit. II, § 1–4. Under Colorado State law the title, like the preamble of a bill, is only relevant in the event the legislative intent cannot be gleaned from the plain language of the bill. *City of Littleton*, 787 P.2d at 161. Such is not the case with the Ordinances before the court.

### C. *Continental's Right to a Refund*

■ The final issue is whether Continental is entitled to a refund or credit of overpaid use tax for February, March and April. At the outset, Continental concedes that its March Claim for Refund was filed one month late and a Claim for Refund was never filed for February overpayment. The most Continental requests is a determination that it is entitled to a credit for February and March (and a refund of the April overpayments).

As discussed in Part I., Denver objects to the Claims for Refund on both procedural and substantive grounds. The court has found against Denver on the substantive issue—whether Continental is entitled to claim the February Exemption. Also, the court found that procedural deficiencies were irrelevant in deciding whether this court has jurisdiction over the claims for refund under section 505(a)(2)(B)(ii). However, now that the court must determine Debtor's entitlement to a refund under the Denver Revised Municipal Code, procedural deficiencies are relevant.

Under the Denver use tax article "[a]pplications for refund must be made within sixty [ ] days after the purchase of the goods or the performance of the services on which the exemption is claimed." Den. Rev.Mun.Co. § 53–111(b). Since the sixty days would apparently run from the date the use tax return is due, the only claim for refund to be timely filed is the April claim filed July 19, 1991. Continental is entitled to a refund of the April use tax, but to a credit only for the February and March use tax, for which it has filed amended tax returns.

An order in accordance with the Memorandum Opinion is attached.

### ORDER

AND NOW, February 4, 1992, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT:

1. The motion of the Manager of Revenue for the City and County of Denver is DENIED.

2. Continental Airlines, Inc.'s motion for a refund or credit is GRANTED.

3. The Manager of Revenue is ordered to compute Continental's tax credit for February and March and the amount of refund for April, with interest to accrue from the date of this Order.