**In re CONTINENTAL AIRLINES, INC., et al., Debtors.**

**Patricia BEER, Manager of Revenue of the City and County of Denver, Colorado, Appellant,**

**v.**

**CONTINENTAL AIRLINES, INC., et al., Appellees.**

**Civ. A. No. 92–244–JJF.**

United States District Court, D. Delaware.

Jan. 12, 1993.

S. David Peress, and Paul P. Welsh, of Morris Nichols Arsht & Tunnell, Wilmington, DE, for debtors/appellees Continental Airlines, Inc., et al.

Jeoffrey L. Burtch, of Cooch & Taylor, Wilmington, DE, for appellant Manager of Revenue of the City and County of Denver, Colo.

## OPINION

FARNAN, District Judge.

Presently before the Court is the appeal of the City and County of Denver, Colorado, of the February 4, 1992 Order and Opinion of the United States Bankruptcy Court for the District of Delaware ("the Bankruptcy Court"). The Bankruptcy Court determined that Continental Airlines, Inc. was entitled to an exemption for certain use taxes from February, 1991, through August, 1991. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(d).

## I. PROCEDURAL HISTORY

On August 16, 1991, the City and County of Denver, Colorado ("Denver") filed a Motion for Payment of Administrative Expenses in the Bankruptcy Court pursuant to 11 U.S.C. § 503(a), (b)(1)(B)(i) and (b)(1)(C). In the motion, Denver claimed that it was owed certain use taxes in the amount of $1,494,940.00 plus penalties and interest. Denver amended its motion on October 1, 1991, to seek additional interest and penalties, bringing the total amount sought to $1,684,874.60. This figure represents past due taxes plus interest and penalties from May 1, 1991, to August 8, 1991.

Continental Airlines, Inc. ("Continental") denied liability and filed a Cross Motion for Determination of Tax Liability under 11 U.S.C. § 505. Continental sought to have the Bankruptcy Court determine that it was exempt from tax assessment during the May 1, 1991 to August 8, 1991 time period. Moreover, Continental sought refunds and/or credits totalling $1,259,271.58 for use taxes paid from February 1, 1991 through April 30, 1991.

The Bankruptcy Court held a hearing on the motions on October 24, 1991 and, on February 4, 1992, the Bankruptcy Court issued its decision. The Bankruptcy Court ordered that Denver's motion for payment of administrative expenses be denied and granted Continental's cross motion. Insofar as the tax credits and refunds were concerned, the Bankruptcy Court ordered Denver to calculate the credits for February and March, 1991 as well as the refund due for April, 1991. The Court further ordered that interest was to accrue from February 4, 1992.

## II. THE BANKRUPTCY COURT DECISION

According to the Bankruptcy Court, the key issue in the controversy between Denver and Continental is the meaning of the term "facility" within the context of ordinances enacted by Denver in February, 1991. According to the Bankruptcy Court's Opinion, if the term "facility" re-

fers to only a single enclosed building, the exemption would not apply to Continental's operation at Stapleton Airport in Denver. *In the Matter of Continental Airlines, Inc.*, 138 B.R. 430, 435 (D.Del.1992). If, on the other hand, "facility" refers to one or more buildings, then Continental was exempt from the use tax. *Id.* Thus, the critical task before the Bankruptcy Court was to interpret Denver Ordinance No. 75 which exempted sales of personalty from certain Denver sales and use taxes so long as the personalty was "to be used, consumed, stored, or distributed at a facility ... (b) that contains at least one million square feet of useable floor space and (c) that serves as a ... regular place of reporting for duty for at least two thousand employees." Denver Ordinance No. 75, Series of 1991, effective February 1, 1991, Den.Rev.Mun.Code § 53–97(17) (the February exemption or Ordinance No. 75).

The Bankruptcy Court began its interpretation analysis by discussing that Denver is a "home rule" municipality organized under the Colorado Constitution. *In the Matter of Continental*, 138 B.R. at 435. Thus, any local ordinances that are in conflict with state law supersede the state law within the territorial limits of the municipality. *Id.* citing, Colo. Const., Art. XX, § 6. Thus, the Bankruptcy Court concluded that the Denver sales and use tax provisions superseded any contrary state tax statutes so long as the local ordinance comported with state constitutional requirements. *Id.*

Under Colorado law, when interpreting statutes, "words and phrases shall be read in context and construed according to the rules of grammar and common usage." *Id.* citing Colo.Rev.Stat.Ann. § 2–4–101 (1991). Further, legislative intent is to be considered only in the event that the statute is ambiguous as to the legislature's intent. *Id.* at 436, citing *City of Littleton v. Board of County Com'rs of Arapahoe County*, 787 P.2d 158, 161 (Colo.1990).

Given this background, the Bankruptcy Court determined that the term facility as used in Ordinance No. 75 is broad enough to encompass multiple buildings so long as

they exist to carry out a common purpose. *Id.* The Bankruptcy Court noted the term facility is not defined in Ordinance No. 75 and so it looked to the definition appearing in Webster's Third New International Dictionary, unabridged (1981) and to one provided by a Colorado tax statute that relates to enterprise zones. *Id.* The Bankruptcy Court reasoned that absent a controlling definition the Court must rely on the common meaning of a term. The Bankruptcy Court found that in the context of an airport hub, common usage would direct the Court to find that multiple buildings comprise a facility. *Id.* Thus, the Bankruptcy Court concluded that Continental's operation at Stapleton is a facility because it is "operated for the purpose of transporting passengers and cargo, naturally consists of multiple buildings and area, all of which are necessary to the operation." *Id.*

Next, the Bankruptcy Court considered the arguments of Denver as to whether Continental met all the criteria for the tax exemption. One argument advanced by Denver was that Continental's facility did not contain "at least one million square feet of useable floor space" as required by Denver Ordinance No. 75. *Id.* The Bankruptcy Court concluded the issue was the amount of space leased by Continental, not the amount actually physically occupied by it. The parties stipulated to the following facts: (1) Continental's lease agreement encompasses at least one million square feet of useable space; (2) Stapleton is an "enterprise zone" within the meaning of Ordinance No. 75; and (3) at least two thousand Continental employees report to work at Stapleton. *Id.* Thus, the Bankruptcy Court concluded Continental met all of the requirements of Ordinance No. 75 and was entitled to a tax exemption under the February 1991 exemptions. *Id.*

In August, 1991 however, the February exemptions were repealed and new exemptions were adopted. *Id.* The parties stipulated that under the new ordinance, Ordinance No. 568, Continental would not qualify for a tax exemption but disagreed as to the retroactive effect of Ordinance No. 568. *Id.*

After considering the language of Ordinance No. 568, the preamble to Ordinance No. 568 and Colorado's case law relating to retroactive application of new legislation, the Bankruptcy Court concluded that Ordinance No. 568 was not to be applied retroactively. *Id.* at 437. The Bankruptcy Court reached this conclusion despite the fact that section 4 of Ordinance No. 568 stated that the amended use tax exemption was to be retroactively applied to February 1, 1991.[1] *Id.*

Finally, the Bankruptcy Court considered whether Continental was entitled to a refund or credit for overpaid taxes for February, March, and April, 1991. *Id.* at 438. With respect to this issue, Continental conceded that it filed its March claim one month late, and never filed a claim for February. *Id.* The Bankruptcy Court held that Continental was entitled to a refund for the April payment as it was timely filed, however with respect to the February and March payments, the Bankruptcy Court decided Continental was entitled only to a credit based on the filed amended tax returns. · *Id.*

## III. THE PARTIES' CONTENTIONS

In its appeal, Denver raises several grounds for challenging the decision of the Bankruptcy Court.

## A. JURISDICTIONAL CHALLENGES

As a preliminary matter, Denver challenges the jurisdiction of the Bankruptcy Court to grant a refund or credit to Continental for the Denver use taxes paid. According to Denver, the Bankruptcy Court erred, as a matter of law, in entertaining Continental's Cross motion under 11 U.S.C. 505(a). (Docket Item ("D.I.") 8, pp. 31–41).

Denver concedes that a Bankruptcy Court is given broad authority under 11 U.S.C. § 505(a) to determine the amount or legality of any tax imposed. (D.I. 8, p. 31). But, Denver contends § 505(a) provides two explicit exceptions to the Bankruptcy Court's authority:

(2) the court may not so determine—

(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title; or

(B) any right of the estate to a tax refund, before the earlier of—

(i) 120 days after the trustee properly requests such refund, from the governmental unit from which such refund is claimed; or

(ii) a determination of such governmental unit of such request.

11 U.S.C. § 505(a)(2). Denver, while conceding that the first exception to the Bankruptcy Court's power does not apply, argues that the second exception is applicable. (D.I. 8 at 32). According to Denver, the "request" referred to in 11 U.S.C. § 505(a)(2)(B)(ii) is any request for a refund properly made by the trustee as referred to in 11 U.S.C. § 505(a)(2)(B)(i). (D.I. 8 at 32). Further, Denver contends a request is only properly made by the trustee when done so in a timely manner under local law. (D.I. 8, p. 32).

Denver argues that Continental failed to properly request a refund because it did not file a claim within the limitations period set forth by the Denver Municipal Code and, when it did submit a claim, Continental failed to attach the proper documentation. (D.I. 8, p. 34). In arguing this ground for appeal, Denver focuses on the statutory framework provided by the Denver Municipal Code for what constitutes a timely filing and concludes that none of the requests for a refund were timely. Thus, Denver concludes that the Bankruptcy Court did not have jurisdiction to grant Continental a refund. (D.I. 8, pp. 34–37).

---

1. According to the preamble of the August ordinance, the legislature was amending the tax exemption because it understood that "no facility, building, or enclosed structure or group of such facilities, buildings or enclosed structures currently, as of the date of this enactment, and at all times prior thereto meets the eligibility criteria established for the exemptions granted by Ordinance 75 ..." *Id.* at 437–438.

As a second jurisdictional challenge, Denver argues that even if the Court ignored the specific exceptions to a grant of power under 11 U.S.C. § 505(a)(2) the Bankruptcy Court was still without jurisdiction as 11 U.S.C. § 505 cannot be used to revive a claim that is stale due to the expiration of a limitations period. (D.I. 8, p. 39). According to Denver, because the statute of limitations is a jurisdictional question and Continental failed to raise a claim prior to the expiration of the limitations period, the Bankruptcy Court was without jurisdiction to determine Continental's entitlement to a refund or credit. (D.I. 8, pp. 39–41).

Continental responds that their right to a tax refund or credit was properly before the Bankruptcy Court under 11 U.S.C. § 505(a) and was before the Court by way of Denver's motion for administrative expenses pursuant to 11 U.S.C. § 503. (D.I. 11, pp. 37–38). According to Continental, the Bankruptcy Court was the only Court with jurisdiction to entertain Denver's administrative claim and once that process began, it would be duplicative for all issues relating to the use tax not to be determined in one proceeding. (D.I. 11, pp. 38–40).

With respect to the specific exceptions of jurisdictional power present in 11 U.S.C. § 505(a)(2), Continental disagrees with Denver's interpretation of § 505(a)(2)(B). (D.I. 11, p. 41). According to Continental, the second exception provides a time limitation for the Court to determine the right to a tax refund rather than providing for an express denial of jurisdiction. (D.I. 11, p. 41). Subpart (2) of subsection (a) provides that the court "may not so determine—any right of the estate to a tax refund, before the earlier of" and then provides two timing events. (D.I. 11, p. 41). Continental contends it has already fulfilled one of these timing requirements and therefore, the other is irrelevant in deciding the Bankruptcy Court's jurisdiction. (D.I. 11, p. 41). Continental contends that the Bankruptcy Court was vested with the authority to hear its claim on August 15, 1991, the date the City of Denver denied its request for a refund because the local taxing authority made a determination in the matter, and

thus the earlier of the two time frames was fulfilled. (D.I. 11, p. 41).

With respect to whether the claim by Continental was properly filed or not, Continental concedes it did not timely file its March, 1991 claim for refund and requested the Bankruptcy Court to consider its claim a request for a credit. (D.I. 11, p. 42). However, with respect to the April refund request, Continental claims it was timely filed and therefore properly before the Court. (D.I. 11, p. 42). In this regard, Continental cites Denver legislative authority, case law and public policy for the propositions that: (1) an original filing is not required; (2) a claim for refund is deemed filed upon mailing to the Manager of Revenue; (3) a claim for refund is not due until 60 days after the filing was required, as opposed to Denver's contention that the 60 days begins running prior to the time the original filing was due; and (4) Continental complied with all reasonable procedural requirements of the Denver Claim for Refund process. (D.I. 11, pp. 42–46).

Finally, Continental argues that although refund claims for February and March 1991 would have been untimely, it filed amended returns to provide the Bankruptcy Court with a record to determine the amount of credit to which Continental was entitled. (D.I. 11, p. 47). Thus, the 60 day time limit applicable to the claim for a refund is not a proper limitations period with respect to February and March claims as those claims were for a credit, not a refund. Further, the 60 day limitations period was met for the April claim for refund and thus, the Bankruptcy Court had the authority to determine Continental's right to a refund for April and its right to credits for February and March pursuant to 11 U.S.C § 505. (D.I. 11, p. 47).

### B. APPLICABILITY OF ORDINANCE NO. 75

#### 1. Meaning of the Term Facility

Denver contends the Bankruptcy Court made an error of law by not construing the term facility in Ordinance No. 75 to mean "a new single building." (D.I. 8, p. 7). According to Denver, the ordinance applies

only to single structures and the Bankruptcy Court erred in applying the exemption to Continental's multiple buildings and leased areas at Stapleton Airport. (D.I. 8, p. 7).

Denver further argues that the Bankruptcy Court improperly applied a state statutory definition of the term facility when considering a municipal ordinance of a "home rule" city. (D.I. 8, p. 20). According to Denver, the Bankruptcy Court should not have turned to a state statute for a definition of the term facility because definitions that appear in local ordinances supersede the definition appearing in a state statute pursuant to Denver's status as a "home rule" city.

Finally, Denver contends that the word facility appears in the ordinance only in the singular and pluralizing it changes the meaning and intent of the legislature. In further support of this contention, Denver presents the Court with several instances where Continental has pluralized the use of the word facility when referring to its operations at a given airport and uses the word in its singular form when referring to a single structure at a given airport. Therefore, according to Denver, Continental views its operations within an airport as comprising multiple facilities, not just one. (D.I. 8, p. 21).

Continental responds that under the clear and unambiguous language of Ordinance No. 75, the Bankruptcy Court properly concluded that their operation at Stapleton Airport would be considered a facility. (D.I. 11, pp. 16–17). According to Continental, only by inserting words and doing a "tortured construction" of the original language can one find that the ordinance was to apply only to new, single structure buildings. (D.I. 11, p. 17).

Continental further contends that when considered in light of Colorado's statutory mandate that all "words and phrases shall be read in context and construed according to the rules of grammar and common usage" Denver's interpretation of the ordinance must fail. Colo.Rev.Stat. § 2–4–101 (1986); Den.Rev.Mun.Code § 1–3 (1990). (D.I. 11, p. 17). Continental argues that Denver's interpretation of the term facility

conflicts with state tax statutes, in that there is no limitation that all areas must be included in a single unit. Thus, Continental asserts the Bankruptcy Court was correct in holding that multiple buildings could comprise a facility. (D.I. 11, pp. 18–19). Thus, according to Continental, the Bankruptcy Court appropriately applied all governing rules of statutory construction and came to the appropriate conclusion that Continental's operation at Stapleton Airport is a facility within the meaning of Ordinance No. 75.

Finally, Continental points to the City Council's contemporaneous enactment of Ordinance No. 74. Ordinance No. 74 specifically refers to the requirement that a structure be newly erected to qualify for a business occupation privilege tax exemption, an exemption Continental did not seek. Thus, Continental argues that had Denver intended to limit Ordinance No. 75 to a newly erected single unit it would have expressly done so and the absence of such language is clear evidence that Denver did not intend such a limitation. (D.I. 11, p. 20).

### 2. Other Requirements of Ordinance No. 75

Denver contends that although Continental leases more than 1,000,000 square feet of useable floor space at or near Stapleton Airport, it is not in a single building and when considered separately, Continental has no single building that meets the 1,000,000 or more square footage requirement of Ordinance No. 75. (D.I. 8, pp. 8–9). Further, Denver argues that no single structure of Continental's at Stapleton Airport has 2,000 or more employees that report to it.

Continental claims that there is no requirement that all the useable area actually be in use, be in the same building or have all two thousand plus employees report to it. (D.I. 11, p. 20–22). Rather, according to Continental, so long as they are obligated by a lease to rent over 1,000,000 square feet, they have fulfilled the space requirement of Ordinance No. 75. Further, Continental argues that they have over 6,000

employees who report to work at Stapleton and that more than fulfills the employment requirement. (D.I. 11, p. 24).

## C. RESERVE ACCOUNT REQUIREMENT

Alternatively, Denver contends that the Bankruptcy Court erred, as a matter of law, by failing to apply to Continental all requirements listed in Ordinance No. 75. (D.I. 8, p. 22). In so arguing, Denver claims that the last paragraph of Ordinance No. 75 contains a condition precedent to the applicability of the exemption, and that Continental has failed to meet this condition. (D.I. 8, pp. 22–23). The last paragraph of Ordinance No. 75 reads as follows:

> This exemption may be applicable to the first and second years of operations at the facility provided that the utility establishes a reserve account for the tax for its return to the city at the end of the third year of operations should less than two thousand (2,000) employees be employed at the facility in said third year.

Ordinance No. 75. According to Denver, the Bankruptcy Court failed to address this portion of the ordinance in construing the statute and applying it to the facts before it. Reading this paragraph as a condition of the exemption, Denver claims Continental is not entitled to the use tax exemption as Continental has conceded that it did not establish such a reserve account.

Continental responds that because it was in its fifth year of operation at Stapleton, the reserve provisions of the last paragraph of Ordinance No. 75 are wholly inapplicable to their operation. (D.I. 11, p. 24). In Continental's view, the last paragraph permits a reserve account to be established for any new facility entitled to such an exemption so that monies would exist and be set aside for the purpose of paying the exempted taxes in the event that following the third year of operation the facility no longer qualified. (D.I. 11, p. 24). Finally, Continental asserts that even if the Ordinance required it to establish the reserve account, it was prohibited from doing so because of the automatic stay provisions of the Bankruptcy Code. (D.I. 11, pp. 24–25).

## D. EFFECT OF ORDINANCE NO. 568

As discussed earlier (supra, p. 5), in August, 1991 the Denver City Council repealed Ordinance No. 75 by enactment of Ordinance No. 568, Series of 1991, effective February 1, 1991, Den.Rev.Mun.Code § 53–97(17) (August 9, 1991) ("Ordinance No. 568" or "the August exemption"). In Ordinance No. 568, the City Council clarified their intent in enacting Ordinance No. 75, repealed Ordinance No. 75, redefined the requirements for the application of the use tax exemption, and provided for retroactive application of the amendment for a limited time period. *See,* Denver Co. Ordinance No. 568 (1991).

Denver contends that the Bankruptcy Court erred as a matter of law: (1) by concluding that Ordinance No. 568 did not have retroactive effect; and (2) by concluding that the intent expressed in Ordinance No. 568 was not controlling in determining the definition of facility under Ordinance No. 75. (D.I. 8, pp. 23–30). Denver argues that retroactive application of Ordinance No. 568 does not offend either the United States Constitution or the Constitution of the State of Colorado. (D.I. 8, p. 25). Denver asserts that under the Colorado Constitution, retroactive application of legislation is proper so long as it "does not impair vested rights, create new obligations or duties, or attach disabilities with respect to past transaction." (D.I. 8, p. 26 (citing, *Zaragoza v. Director of Dept. of Revenue,* 702 P.2d 274, 276 (Colo.1985))). Denver argues that Ordinance No. 568 does not create new obligations or duties because, under Colorado case law, tax provisions may be retroactively applied so long as it is not harsh, arbitrary or unfair. (D.I. 8, pp. 26–27). Thus, Denver argues Ordinance No. 568 is entitled to great weight in the interpretation of Ordinance No. 75. (D.I. 8, p. 30).

Continental, on the other hand, responds that retroactive application of Ordinance No. 568 would violate Article II, § 11 of the Denver Constitution which prohibits *ex*

*post facto* legislation. (D.I. 11, p. 26). According to Continental, the Constitution prohibits implementing laws that would retroactively affect obligations and therefore, the application of Ordinance No. 568 would create new obligations that Continental would be subject to.

Further, Continental argues that the August 1991 amendments do not merely clarify the earlier ordinances, rather they substantially change the meaning of those ordinances and as such should not be retroactively applied. (D.I. 11, pp. 35). Finally, Continental contends that retroactive application of the August 1991 amendments would violate the United States Constitution by offending the Due Process Clause of the Fourteenth Amendment. (D.I. 11, pp. 35–37).

## IV. STANDARD OF REVIEW

On appeal of a Bankruptcy Court decision, the district court is to show deference to the Bankruptcy Court's findings of fact unless they are found to be clearly erroneous. Fed.R.Bankr.P. 8013; *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 38–39 (3d Cir.1989). However, legal questions are subject to plenary review. Fed.R.Bankr.P. 8013. Generally, questions of statutory construction are considered questions of law and thus, on appeal, subject to *de novo* consideration. *In re Sierra Steel Corp.*, 88 B.R. 314, 316 (D.Colo.1987).

While the determination of whether a statute is ambiguous or not may be subject to a clearly erroneous standard, the interpretation of that statute regardless of its ambiguity is a plenary consideration. *See, In re Barclay Industries, Inc.*, 736 F.2d 75, 78 (3d Cir.1984); *Matter of Dunes Casino Hotel*, 63 B.R. 939, 944 (D.N.J.1986).

## V. DISCUSSION

### A. JURISDICTIONAL CHALLENGES

Title 11 U.S.C. § 505(a) grants the Bankruptcy Court broad authority to hear issues related to the determination of a debtor's tax liability. This authority includes the ability to determine:

[t]he amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

11 U.S.C. § 505(a)(1). While the authority of the Bankruptcy Court is broad, it is not unrestricted. As previously discussed there are two express restrictions on the authority of the Bankruptcy Court to make such determinations. They are:

(2) The Court may not so determine—

(A) the amount or legality of a tax, fine, penalty or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title; or

(B) any right of the estate to a tax refund, before the earlier of—

(i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or

(ii) a determination by such governmental unit of such request.

11 U.S.C. § 505(a)(2)(A), (B).

 Denver contends that the Bankruptcy Court's jurisdiction was limited by § 505(a)(2)(B). Title 11 U.S.C. § 505(a)(2)(B) provides that the Bankruptcy Court is without power to determine the estate's right to a tax refund prior to the earlier of two alternative conditions. The first condition requires a minimum of 120 days to pass from the time the trustee requests the governmental unit to make such a refund. 11 U.S.C. § 505(a)(2)(B)(i). The second condition is a determination by the governmental unit regarding the refund. 11 U.S.C. § 505(a)(2)(B)(ii). Thus, the trustee must have either permitted sufficient time to pass following the request for a refund or the government unit, with power to review a request for refund, must have issued a determination prior to raising the question in the Bankruptcy Court. If neither of these conditions are met, then

the Bankruptcy Court is without jurisdiction.

 The Court concludes that the earlier of the two provisions in § 505(a)(2)(B) occurred on August 15, 1991. There is no question that on August 15, 1991 the Department of Revenue for the City and County of Denver issued a decision regarding the claim for a tax refund submitted by Continental. Thus, the Court concludes that the exception limiting the Bankruptcy Court's power to determine a claim for a tax refund is inapplicable in this case and the Bankruptcy Court properly entertained the Cross Motion for Determination of Tax Liability filed by Continental.

 Denver would have this Court read into § 505(a)(2)(B) a provision that is not present. Denver's argument is that only claims for refunds that are timely asserted to the local governmental entity may later be raised in a bankruptcy proceeding and therefore since the Denver Department of Revenue determined the requests for refunds were not timely, the Bankruptcy Court was without power to consider the claims. The Court disagrees. The broad grant of power in § 505 cannot fail merely because of a procedural default by the trustee. To decide otherwise would be to say only determinations of a substantive nature are reviewable in a bankruptcy hearing and that any potential procedural default of the trustee cannot be considered by the Bankruptcy Court.

 Further, the Court does not agree with Denver's assertion that the time for requesting a refund is the equivalent of a statute of limitations. The Court concludes that the timeliness of the request for a refund does not act as a statute of limitations bar for consideration by the Bankruptcy Court of a tax claim. The Denver Department of Revenue apparently agrees. The Department of Revenue disallowed the refund based primarily on untimeliness, but also referred to the merits of the claim in denying the refund.

 Alternatively, the Court concludes the only claim subject to the restrictions in section 505(a)(2)(B) was the claim by Continental for an April, 1991 refund. Continental was requesting a credit for the February and March 1991 taxes paid rather than a refund and thus, under the Bankruptcy Code the Bankruptcy Court would have full authority to determine the "amount or legality of these taxes" pursuant to § 505(a)(1).

After Continental converted the claims for February and March, 1991 taxes paid into ones for a tax credit the restrictions of section 505(a)(2) were no longer applicable. The Bankruptcy Code clearly delineates between determinations regarding the amount and legality of taxes and those requests for refunds. Only in the later case is the Bankruptcy Court's authority restricted so as to afford the local governmental agency an opportunity to review the request. Therefore, the February and March, 1991 requests for a tax credit could not, under any circumstances, be subject to the restrictions present in section 505(a)(2), only the April request, which remained one for a refund, could be subject to the restrictions present.

 With respect to the April tax refund request, the Bankruptcy Court found that the request was filed on July 19, 1991, within the 60 day time limit imposed under Denver Municipal law. *Opinion* at p. 438. The appeal does not turn on this decision and the Court finds there is support in the record to make such a finding. Thus, this Court cannot say that the Bankruptcy Court's finding was clearly erroneous. Therefore, the request for a refund of April taxes was timely filed within the provisions of the Denver Code. In sum, the Court concludes the Bankruptcy Court had jurisdiction to determine Continental's entitlement to tax credits and refunds for February through April, 1991.

## B. INTERPRETATION AND APPLICABILITY OF ORDINANCE NO. 75

 Having concluded the Bankruptcy Court had jurisdiction to determine Continental's tax liability the Court may now turn to other issues raised by Denver. Under Colorado law, Courts must strictly construe tax exemption statutes against the taxpayer and it is the burden of the taxpayer to prove they are entitled to the exemption by clear and convincing evidence. *At-*

*lantic Coast Line R. Co. v. Phillips,* 332 U.S. 168, 172, 67 S.Ct. 1584, 1587, 91 L.Ed. 1977 (1947); *American Respiratory Care Services v. Manager of Revenue, City and County of Denver,* 835 P.2d 623, 625 (Colo. App.1992) (citations omitted); *Denver Center for the Performing Arts v. Briggs,* 696 P.2d 299, 308 (Colo.1985); *State v. Fisch's Estate,* 153 Colo. 525, 387 P.2d 282, 285 (Colo.1963); Den.Rev.Mun.Code § 53–11. Thus, only if Continental meets the requirements of the statute, as interpreted by the Court, will they be entitled to the exemption provided for in Ordinance No. 75.

■ The Court's review of the Bankruptcy Court's interpretation and application of Ordinance No. 75 and it terms, including the use of the term "facility", is plenary. In Colorado, principles of statutory construction are equally applicable in the interpretation or construction of municipal ordinances. *American Respiratory Care Services v. Manager of Revenue, City and County of Denver,* 835 P.2d 623, 625 (Colo. App.1992). Therefore, it is necessary to consider the guidance relating to statutory construction that is available in the law of Colorado.

Under Colorado law, "the primary objective is to ascertain the intent of the General Assembly for the language used, and give effect to that intent if possible." *American Respiratory Care Services,* 835 P.2d at 625 (1992), *citing, Stephen v. City and County of Denver,* 659 P.2d 666 (Colo. 1983); *People v. District Court, Second Judicial Dist.,* 713 P.2d 918 (Colo.1986). In order to determine the legislative intent, the Court first looks to the language of the statute itself. *American Respiratory Care Services,* 835 P.2d at 625; *People v. Warner,* 801 P.2d 1187 (Colo.1990); *Griffin v. S.W. Devanney & Co., Inc.,* 775 P.2d 555 (Colo.1989). With respect to the language found in a statute "words and phrases shall be read in context and construed according to the rules of grammar and common us-

age." *American Respiratory Care Services,* 835 P.2d at 625; Colo.Rev.Stat. § 2–4–101; Den.Rev.Mun.Code § 1–3. If the language is clear and the intent appears with reasonable certainty, there is no need to resort to other rules of statutory construction. *People v. District Court, Second Judicial Dist.,* 713 P.2d at 918.[2]

*1. Meaning of Term "Facility" as used in Ordinance 75*

The Court will first review the Bankruptcy Court's findings and conclusions with regard to the meaning of the term "facility" in Ordinance No. 75.

a. Ordinary Meaning of Words

■ In construing the term facility in Ordinance No. 75 the Bankruptcy Court, in applying the common usage of the word principle, turned to Webster's Third New International Dictionary, unabridged (1981) to obtain a definition.

A Court is instructed to determine the common usage of a word, but to do so "in context." Colo.Rev.Stat. § 2–4–101; Den. Mun.Rev.Code § 1–3. In this case, the context in which the word facility was used in the subject ordinance is clearly in relation to a "transportation utility." *See* Ordinance No. 75. Thus, in determining the plain meaning of the word facility, the Court is required to do so in the context of a transportation utility.

Denver has cited several statutes and regulations that contain a definition of the word facility in relation to a transportation facility that would indicate it refers to a single building, rather than multiple buildings within the context of an airport. (D.I. 8, pp. __; D.I. 14, pp. 7–9). Further, Denver provided the Court with examples of Continental itself using the word facility to indicate a single building and the word facilities when indicating multiple buildings within the context of an airport. (D.I. 9, ex. 20).

---

**2.** The Bankruptcy Court interpreted the *City of Littleton,* 787 P.2d 158 as standing for the proposition that only in cases where the statute is found to be ambiguous should a Court turn to legislative intent for statutory construction pur-

poses. Clearly, however, under Colorado law, the controlling principle is that the Court is instructed to uphold the legislative intent in enacting a statute.

It is clear that the term facility has a much narrower meaning when considered in the context of a transportation utility, than the meaning or definition set forth in Webster's. Since the Court's task is to determine the meaning of a disputed term "in context" the Court concludes that the Bankruptcy Court erred in considering a general definition of facility from Webster's Dictionary without giving consideration to the context in which it was being used.

■ In this regard, it is difficult to determine the meaning of the term facility with reasonable certainty by a plain reading of Ordinance No. 75 because the Court finds the term facility as used in Ordinance No. 75 to be reasonably subject to differing meanings. The Court concludes the term facility is ambiguous. Thus, a review of the legislative history regarding the enactment of the ordinance is helpful to determine the intent of the legislative body.

### b. Legislative Intent

■ Denver claims that its intent in enacting the ordinance was to attract new transportation utilities to the Denver area. Denver supports its contention with certified copies of the agenda, minutes and handouts from the meeting at which Ordinance No. 75 was considered and passed. (*See*, D.I. 9, tab 12). The Bankruptcy Court sustained the objection of Continental when Denver attempted to move these exhibits into evidence on the grounds that the statute was not ambiguous and therefore the legislative history was not relevant. (D.I. 9, tab 6, Transcript pp. 214–216).[3]

The Court finds that the Bankruptcy Court erred when it excluded the legislative history exhibits, particularly because of the need to consider the intent of the Denver City Council in enacting Ordinance No. 75. Thus, the Court will utilize the offered exhibits in its effort to capture the legislative intent of the subject ordinance.

In reviewing the minutes of the Economic and Cultural Development Committee, it is clear the intent of the committee members in considering the enactment of Ordinance No. 75 was to attract a proposed United Airlines Maintenance Facility. (D.I. 9, tab 12, pp. A–94, A–96 and A–97). The supporting documentation relating to the economic impact to the Denver area of the proposed United Airlines Maintenance Facility indicates there would be approximately 1.5 million new square feet built and utilized under one roof. Further, as proposed, there would have been sufficient jobs created to meet the employment criterion to be required in Ordinance No. 75. (D.I. 9, tab 12, pp. A–96 and A–97). This evidence supports Denver's contention that it intended only to exempt a facility from use taxes if the facility was new and consisted of a single structure.

The Court cannot ignore the clear intent of the committee and the council with regard to the type of facility intended to be exempted by Ordinance No. 75. The clear intent of the City Council was to attract new transportation utilities like United to the Denver area; it was not to provide operating utilities, such as Continental, with a tax break. By attracting new utilities or having current utilities expand into a new facility, Denver intended to increase its job base and support new economic development. The Court concludes that the intent at the time of the enactment of Ordinance No. 75 was to create a tax exemption for transportation utilities, such as airlines, within the Denver enterprise zone, which would construct a substantial facility and guarantee a significant number of new jobs.

Another indicator of the intent of the Denver City Council in enacting Ordinance No. 75 is the preamble to the August, 1991 Amendments. Under Colorado law, although "a subsequent legislative pronouncement of intent is not a part of the legislative history, such statements may be

---

**3.** Another ground for objection to the certified copies being admitted into evidence was stated as follows: "[i]f somebody wants to argue about what they [the statutes] mean in briefs at some point, they can go ahead and do it. Everybody can read legislative history and use it, but it is not evidence and should not be admitted on that basis ..." (D.I. 9, tab 6, p. 215).

considered in construing the statute in question." *BQP Industries, Inc. v. State Bd. of Equalization of the State of Colo.*, 694 P.2d 337, 344 (Colo.App.1984) (citations omitted). Much like the case before the Court now, the court in *BQP Industries* was concerned with a subsequently amended statute:

> Here, the same General Assembly that passed the original statute subsequently stated in a resolution that it was intended to permit depreciation annually from the base year to the date of assessment and that the resolution was passed because the statutory provisions were being interpreted and administered contrary to that intent. Senate Joint Resolution No. 2, 51st General Assembly, Second Extraordinary Session.
>
> In 1980 the General Assembly amended § 39-1-104(9), C.R.S. (1977 Cum.Supp.) to mandate plainly, clearly, and unambiguously that depreciation be allowed annually from the base year to the date of assessment on personal business property. Colo.Sess.Laws 1980, ch. 155, at 714. Such legislation clarifying the intent of an earlier statute is entitled to great weight in statutory construction. *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367 [89 S.Ct. 1794, 23 L.Ed.2d 371] (1969).

*BQP Industries*, 694 P.2d at 344–345.[4]

The Court finds that the August 1991 enactments and discussion of intent are relevant and entitled to weight in determining the Denver City Council's intent in passing Ordinance No. 75. Without instantly deciding the retroactive application of these ordinances, the Court concludes that the preamble to Ordinance No. 568 serves to further clarify the intent of Ordinance No. 75.

Again, the Court is persuaded that Ordinance No. 75 was enacted to address the single structure contemplated by the proposed United Airlines Maintenance Facility, not the aggregation of multiple buildings of existing utilities.

■ The Court concludes that the joining of Continental's multiple buildings at Stapleton Airport does not meet the "facility" requirements of Ordinance No. 75 or Ordinance No. 568 and therefore, Continental did not qualify for the local use tax exemption allowed by the subject ordinances. To do so, would be to read the ordinances too broadly and in contravention of the Denver City Council's intent.

### 2. Other Requirements of Ordinance No. 75

■ The Court also concludes that Continental has failed to fulfill the other requirements of Ordinance No. 75, in particular the requirement that the facility contain one million square feet of useable floor space. Regardless of whether facility means a single structure or multiple structures, the Court concludes that the portion of space leased by Continental that is then subleased to others should be excluded from the calculation to determine if the 1,000,000 square foot space requirement is met.

Continental argued and the Bankruptcy Court agreed that as long as Continental was obligated under leases for one million square feet of space within the designated area they fulfilled the square footage requirement of Ordinance No. 75. According to Continental, it should be permitted to aggregate all space it leases and is thus "responsible for," regardless of whether it actually occupies the space. The Court agrees that Continental may include any space for which it is "responsible", however, Continental cannot include in the calculation space it has subleased to others. (e.g. 45,894 square feet leased by Chelsea Catering Corporation (D.I. 9, tab 6, pp. 148–149)). The Court finds that Continental is no longer "responsible" for such subleased space within the meaning of Ordi-

---

**4.** In *BQP Industries* the Court was concerned with imposing a tax obligation on an individual. In that context, a statute is to be construed strictly in favor of the taxpayer. *BQP Industries*, 694 P.2d at 345. Again, in construing a statute which grants an exemption, the burden of proof is on the taxpayer and the statute is to be strictly construed against granting the exemption.

nance No. 75. The Court finds that space subleased by Continental to others should be deducted for three reasons. First, Continental is not responsible for the operation and maintenance of such space. Second, there is no potential for sales of personalty that would qualify for the tax exemption within the subleased area. Third, no Continental employees could report for duty in such space. Unlike unused space that Continental could eventually use in its operations, square footage that has been subleased no longer can be occupied for purposes of using, consuming, storing or distributing personalty. For these reasons, the Court finds such space should be excluded from consideration in calculating the total square footage requirements of the ordinance.

When the square footage of the subleased area is deducted from the total amount of leased space, Continental falls below the one million square footage requirement. Falling short of the minimum square footage requirement, Continental is not entitled to claim the exemption.[5]

### 3. Procedural Default of Continental

■ Even if the Court were to hold that multiple pre-existing structures could be considered a facility within the context of the ordinance, the Court concludes Continental would still be unable to avail itself of the exemption. Ordinance No. 75 is explicit in terms of the timing for requesting a refund. In order to be eligible for a refund, Continental must have requested it within sixty days. Continental failed to request a refund for February and March 1991 within that time frame. Thus, the Court concludes that Continental is unable to obtain a refund *or a credit* for those months. While the Bankruptcy Court placed significant weight on an apparent difference between a credit and a refund the Court is unable to discern any significant difference. The effect of granting a

tax credit or a refund in the context of the subject use tax exemption is identical. Under either the credit or refund theory, the practical result is that the use tax Continental paid would be returned to it in a short period of time. Thus, the Court concludes that the time for requesting a refund under Ordinance No. 75 is equally applicable to a request for a credit and subject to the sixty day period provided in the ordinance.

■ Further, Continental failed to supply the documentation required when requesting a refund. To later submit amended tax returns that are not authorized within the statutory framework in an effort to obtain a refund is an empty act. The ordinance explicitly requires the party seeking a refund to submit original invoices. Continental failed to supply these. Regardless of whether Continental was entitled to a refund, they failed to comply with the statutory requirements for obtaining a refund. Thus, they are not entitled to a refund or credit for taxes paid in any of the relevant three months.

■ Although the Court does not find their non-compliance with the statutory framework to create a jurisdictional bar to the Bankruptcy Court hearing and deciding this matter, the Court does conclude that the non-compliance by Continental with the provisions of the ordinance does act as a bar to any refund or credit. The requirements of the statute are explicit and Continental failed to comply with the procedural requirements in requesting a refund even if one were available to them under Ordinance No. 75.

### C. RESERVE ACCOUNT REQUIREMENT

■ The reserve account requirement has concededly not been complied with by Continental. Continental argues that because they have been in operation for more

---

5. When this area is excluded from the calculation the total useable area falls below one million square feet. According to testimony, if only the unused space (42,913.06 square feet) were deducted from the total leased space then the total square footage would be under 1,000,- 000 square feet. Therefore, it follows, that if only the subleased space (45,894 square feet) were to be deducted from the total, the total useable floor space would also necessarily be below the required 1,000,000 square feet.

than three years it need not comply with this requirement and, further, that even if it had to comply with the requirement it would have been unable to segregate the necessary funds because they were a debtor in bankruptcy. The Court is unpersuaded.

With respect to whether Continental could have segregated the funds while in bankruptcy, the Court concludes that is not a determination for the debtor, in its discretion, to make.

In any event, the Court is persuaded that any reading of the reserve account requirement hinders Continental's position. If the Court reads the reserve account requirement as Continental suggests (that it only applies to new operations) then that lends credence to the argument of Denver that the statute was only intended to encompass a new facility. *See, supra.* However, if the Court reads the reserve account requirement to apply to all operations then a fair reading would be that any facility claiming the exemption must comply with the requirement for the first two years, which Continental admittedly did not do. Since the burden remains on the taxpayer when claiming a tax exemption, the Court concludes that Continental has been unable to meet this burden by its failure to comply with the applicable reserve account requirement.

## VI. CONCLUSION

For the reasons discussed, the Court concludes Continental does not qualify for the local tax exemption created by the enactment of Ordinance No. 75 by the Denver City Council.

Thus, the Court will reverse the Order of the Bankruptcy Court dated February 4, 1992.

An Order consistent with this Opinion will be entered.